STATE of Wisconsin, Plaintiff-Respondent,

v.

Patrick E. HAMPTON, Defendant-Appellant.†

Court of Appeals

*No. 2009AP3040–CR. Submitted on briefs October 6, 2010.
—Decided November 2, 2010.*

2010 WI App 169

(Also reported in 793 N.W.2d 901.)

† Petition for Review denied 3-15-11.

531

535

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Michael S. Holzman* of *Rosen and Holzman LTD*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general, and *James M. Freimuth*, assistant attorney general.

Before Curley, P.J., Fine and Brennan, JJ.

¶ 1. BRENNAN, J. Patrick E. Hampton appeals from a judgment entered after he pled guilty to first-degree reckless homicide. He contends that the circuit court erred when it denied his motion to suppress the statements he made to police on July 20 and 21, 2008. Hampton claims that, at the outset of the July 20 interview, he expressly invoked his right to counsel and to remain silent and again expressly invoked his right to counsel two hours and thirty-eight minutes into the interview. Additionally, he contends that he never waived those rights. Because we conclude that Hampton's Fifth and Sixth Amendment rights were not violated, we affirm the circuit court.

## BACKGROUND

¶ 2. The background facts are those testified to by Detectives Timothy Heier and Mark Peterson at the suppression hearing and those revealed by the audio tapes of Hampton's interviews with detectives on July 20 and 21, 2008. The relevant facts do not appear to be in dispute.

¶ 3. On July 20, 2008, at approximately 2:40 p.m., Hampton was arrested,[1] processed, and placed in a private cell at the Milwaukee Police Department until 7:20 p.m., when he was placed in an interview room. Beginning at 7:43 p.m., Detectives Heier and Jeremiah Jacks began questioning Hampton about the July 15, 2008 death of Carlton Stovall, Hampton's roommate.

---

[1] At the time Hampton was arrested, there was not a warrant out for his arrest and a complaint had not yet been filed. Consequently, the basis of his arrest is not clear. However, Hampton has not challenged the basis for his arrest, and we have no reason to believe the arrest was improper.

The detectives were not carrying guns, and Hampton was not handcuffed.

¶ 4. Shortly after the interview began, Hampton interrupted Detective Heier, stating: "Mark told me to talk to nobody but him."[2] Detective Heier confirmed that Hampton was referring to Detective Peterson, whom Hampton knew from prior contacts. Detective Heier told Hampton that Detective Peterson's shift had ended and that he was gone for the day.

¶ 5. Detective Heier then resumed explaining the interview process to Hampton, when Hampton interrupted again, stating: "I know how this stuff go. I know all about this." Detective Heier confirmed that Hampton had prior arrests. Hampton then continued:

> He [Detective Peterson] told me to talk to nobody but him . . . . I know how this stuff go, OK. I really don't want to say nothing. I don't have no lawyer. And understand, like I said, he told me to say nothing . . . . I know how it go. Good cop, bad cop . . . . He told me to talk to him.

¶ 6. In response, Detective Heier told Hampton that Detective Peterson had directed Detectives Heier and Jacks to talk to Hampton. Hampton reiterated that Detective Peterson "told me to talk to nobody but him." Nevertheless, Hampton proceeded to respond to background questions posed by Detective Heier.

---

[2] The parties did not provide the circuit court or this court with transcripts of the audio tapes recorded at the July 20 and 21 interviews. Consequently, we do not contend that the quotations cited in this opinion are exact translations of what occurred. However, after listening to the audio tapes, we believe the quotations are near exact and the parties have set forth close approximations of these quotations in their respective briefs. Their content does not appear to be in dispute.

¶ 7. After Hampton answered basic background questions, Detective Heier told Hampton that he needed to inform Hampton of his rights. Hampton replied that he had been given his rights before. Regardless, Detective Heier proceeded to read Hampton the *Miranda* rights[3] off the standard Department of Justice card. When asked if he understood his rights, Hampton answered, "yes, sir."

¶ 8. Detective Heier then asked Hampton if he was willing to talk with the detectives. The audio tape does not reflect what, if anything, Hampton said or did immediately after Detective Heier's question. However, a few seconds later, Hampton stated: "I really don't want to make no statement. Do I got to talk to both of you all? Or I can just talk to one of you all? . . . I'm supposed to be talking to Mark [Detective Peterson]."

¶ 9. Over the next few minutes, Detective Heier explained the purpose of having two detectives in the interview room. Detective Heier then again asked Hampton: "Do you want to talk to us?" Hampton replied: "I want to talk, but I don't want to talk to both" detectives. Detective Heier testified that he understood Hampton to be waiving his rights. Over the next two hours, Detective Heier questioned Hampton, and Hampton responded to the questions.

¶ 10. Two hours and thirty-eight minutes into the July 20 interview, Hampton interrupted Detective Heier's questions, and the following exchange occurred:

[3] Under *Miranda v. Arizona*, 384 U.S. 436 (1966), persons facing custodial interrogation must be warned that they have the right to remain silent, that anything they say may be used against them in a court, that they have the right to an attorney, and that an attorney will be appointed for them if they cannot afford one. The State concedes that Hampton was in custody and that he was being interrogated by detectives at all times relevant to Hampton's claims.

539

**HAMPTON:** I'm not trying to be rude or nothing. I just want to talk to a lawyer.

**DETECTIVE HEIER:** Any specific lawyer you want us to call?

**HAMPTON:** No. I don't know.

¶ 11. The next twenty seconds of the audio tape reflects sounds suggesting that the detectives were packing up to leave, a suggestion confirmed by the following exchange initiated by Hampton:

**HAMPTON:** Are you guys gonna leave?

**DETECTIVE HEIER:** Yeah. If you wanna talk to a lawyer, we're not going to talk to you . . . . You're in charge . . . . If you want a lawyer, I respect that and I'll honor that.

¶ 12. Detective Heier then told Hampton that a police officer was going to come in to photograph the cuts on Hampton's hands. Hampton responded: "I just don't want you guys to leave right now." Detective Heier explained to Hampton that because Hampton had requested a lawyer, the detectives could not talk to him. Detective Heier told Hampton that he could retain a public defender if he could not afford to hire an attorney. Detective Heier also offered to reread Hampton the *Miranda* rights.

¶ 13. After taking a few minutes to consider his options, Hampton stated: "I really do want to talk to you guys . . . I just need some time." Hampton requested thirty to forty minutes alone to read the Bible, pray, and talk to God before he continued to talk to detectives. Detective Heier granted Hampton's request, and then told Hampton: "If you want to talk to us again, we'll talk to you again," and Hampton replied: "I do. I do. I

540

really do. I just need some time." Detective Heier thereupon stopped the interview at 10:32 p.m., gave Hampton a Bible, and left Hampton to himself.

¶ 14. The interview resumed an hour later at 11:32 p.m. when Detective Heier alone met with Hampton in the interview room and reread Hampton his *Miranda* rights. When asked if he understood those rights, Hampton responded, "yes, sir." The following exchange then occurred:

> **HAMPTON:** I don't want to say the wrong thing. I don't want to say the wrong thing.
>
> **DETECTIVE HEIER:** . . . Do you want to talk to me?
>
> **HAMPTON:** I guess I'll talk about some things.

¶ 15. The interview then continued for another hour, until Hampton announced to Detective Heier: "I just don't want to talk right now." Shortly thereafter, Hampton added: "I want to talk to you again." But at that point, at 12:42 a.m., five hours after the interview began, Detective Heier ended the interview and Hampton was returned to his private cell. Hampton made no incriminating statements during the July 20 interview.

¶ 16. At 2:47 p.m. on July 21, fourteen hours after the first interview had ended, Detective Peterson, who Hampton had requested to speak with at the first interview, accompanied by Detective Billy Ball, interviewed Hampton about Stovall's death. Detective Peterson read Hampton his *Miranda* rights at the outset of the interview. Hampton indicated that he understood his rights and answered, "yes, sir," when asked if he agreed to waive his rights and to speak to the detectives about the homicide.

¶ 17. The July 21 interview took place in an interview room at the police station. According to Detective Peterson's testimony, Hampton was not handcuffed, and never asked for counsel or to remain silent. The interview lasted two hours and twelve minutes, during which time Hampton admitted to killing Stovall while high on drugs.

¶ 18. Consequently, on July 23, 2008, the State filed a criminal complaint charging Hampton with one count of first-degree reckless homicide. Hampton filed a pretrial motion, seeking to suppress the statements he made to Milwaukee police detectives on July 20 and 21, and any evidence derived therefrom. He argued that during the July 20 interview he never affirmatively waived his rights and he was questioned even after asking for an attorney, requiring that any statements he made to detectives that day be suppressed. He further argued that his statements to detectives on July 21 were not sufficiently attenuated from the July 20 violations and should be suppressed as well.

¶ 19. Following a hearing on the motion, at which both Detectives Heier and Peterson testified, and following the circuit court's review of the audio tapes of the interviews, the circuit court denied Hampton's motion.[4] The circuit court concluded that Hampton never unequivocally invoked his right to counsel at the start of the July 20 interview, and later, after Detective Heier read Hampton his *Miranda* rights, Hampton voluntarily waived those rights. The court also concluded that although Hampton invoked his right to counsel two hours and thirty-eight minutes into the July 20 interview when he said, "I just want to talk to a

---

[4] The Honorable John Franke presided over the suppression hearing and entered the order denying the motion.

lawyer," Hampton thereafter initiated a discussion about the case when he told detectives he did not want them to leave. The court found that Hampton was again read his *Miranda* rights and waived them after invoking his right to counsel.

¶ 20. With respect to the July 21 interview, the circuit court found that Hampton was given his *Miranda* rights at the outset of the interview and waived them. The circuit court also concluded that even if Hampton had invoked his right to an attorney during the July 20 interview, there was a sufficient break between interviews so as not to taint the July 21 interview.

¶ 21. Subsequently, pursuant to a plea agreement, Hampton pled guilty to the original charge of first-degree reckless homicide, and the State agreed to recommend "substantial confinement." The circuit court accepted Hampton's guilty plea and later sentenced Hampton to twenty-five years of initial confinement to be followed by fifteen years of extended supervision.[5]

¶ 22. Hampton appeals the circuit court's denial of his motion to suppress.

## STANDARD OF REVIEW

¶ 23. Ordinarily, a guilty plea waives all nonjurisdictional defects and defenses. *See County of Racine v. Smith,* 122 Wis. 2d 431, 434, 362 N.W.2d 439 (Ct. App. 1984). A narrowly crafted exception to this rule exists

---

[5] Judge Franke also presided over Hampton's plea hearing. However, the Honorable Carl Ashley presided over Hampton's sentencing hearing and entered the final judgment.

in WIS. STAT. § 971.31(10) (2007–08),[6] which permits appellate review of an order denying a motion to suppress evidence, not withstanding a guilty plea. *Smith*, 122 Wis. 2d at 434–35. We review the denial of a motion to suppress under a two-part standard of review, upholding the circuit court's factual findings unless clearly erroneous but reviewing *de novo* whether those facts warrant suppression. *See State v. Drew*, 2007 WI App 213, ¶ 11, 305 Wis. 2d 641, 740 N.W.2d 404.

## DISCUSSION

¶ 24. Hampton seeks to overturn the circuit court's decision, denying his motion to suppress statements he made to detectives during the July 20 interview, at which he said nothing incriminating, and during the July 21 interview, at which he confessed to Stovall's murder. With respect to the July 20 interview, Hampton argues the following:

> (1) that at the outset of the July 20 interview he invoked his Fifth and Sixth Amendment rights to counsel, as well as his Fifth Amendment right to remain silent, when he told police:
>
> > He [Detective Peterson] told me to talk to nobody but him . . . . I know how this stuff go, OK. I really don't want to say nothing. I don't have no lawyer. And understand, like I said, he told me to say nothing . . . . I know how it go. Good cop, bad cop . . . . He told me to talk to him;
>
> (2) that after Detective Heier read the *Miranda* rights to Hampton twenty-six minutes into the first interview, Hampton never waived those rights; and

---

[6] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

(3) that two hours and thirty-eight minutes into the July 20 interview, Hampton invoked his Fifth and Sixth Amendment rights to counsel when he told detectives: "I'm not trying to be rude or nothing. I just want to talk to a lawyer."

Hampton then goes on to argue that the alleged violations from the July 20 interview tainted statements he made to detectives during the July 21 interview. We disagree and affirm.

## I. Sixth Amendment Right to Counsel

¶ 25. As an initial matter, we conclude that Hampton's Sixth Amendment rights were not implicated during the interviews. The Sixth Amendment provides the right to counsel at all crucial stages of a criminal prosecution.[7] *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). However, the Sixth Amendment right to counsel is "offense specific." *Id.* The Sixth Amendment right to counsel in Wisconsin does not attach until after "the filing of a criminal complaint or the issuance of an arrest warrant." *State v. Dagnall*, 2000 WI 82, ¶ 30, 236 Wis. 2d 339, 612 N.W.2d 680, *overruled on other grounds by Montejo v. Louisiana,* ___ U.S. ___, 129 S. Ct. 2079 (2009); *see also State v. Forbush*, 2010 WI App 11, ¶ 2, 323 Wis. 2d 258, 779 N.W.2d 476.

¶ 26. The State argues that because "[a]t the time of the [July 20 and 21] interviews, no complaint had been filed and no arrest warrant had been issued," Hampton's Sixth Amendment right to counsel had not

---

[7] To the extent that Hampton also argues that his Sixth Amendment right to remain silent was violated, we reject his claim because no such right exists.

attached to the first-degree reckless homicide charge. Hampton did not contest these facts in his reply brief. And while the record does not reveal the basis for his arrest, Hampton has also not challenged the arrest. Nor has Hampton refuted the State's argument that the Sixth Amendment is therefore not implicated. Consequently, we conclude that Hampton's Sixth Amendment claims are without merit. *See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 108–09, 279 N.W.2d 493 (Ct. App. 1979) (arguments not refuted are deemed admitted).

## II. Fifth Amendment Right to Counsel

¶ 27. Next, Hampton contends that his Fifth Amendment right to counsel was violated during the July 20 interview because: (1) at the outset of the July 20 interview, he invoked his right to counsel; (2) he never orally agreed to waive his *Miranda* rights after they were read to him twenty minutes after the interview began; and (3) two hours and thirty-eight minutes into the interview, he again invoked his right to counsel. We disagree and affirm.

¶ 28. "In *Miranda* [*v. Arizona*, 384 U.S. 436 (1966)], the United States Supreme Court held that law enforcement officers conducting a custodial interrogation must employ procedural safeguards sufficient to protect a defendant's Fifth Amendment and Fourteenth Amendment privilege against compelled self-incrimination." *State v. Armstrong*, 223 Wis. 2d 331, 351, 588 N.W.2d 606 (1999) (citations and quotation marks omitted). Police are required to read those procedural safeguards, commonly known as the *Miranda* warnings, to suspects in custody and under interrogation. *Id.* at

351–52. Once the *Miranda* warnings are properly given, the suspect must then "knowingly and voluntarily waive[] the [*Miranda*] rights" to permit an ensuing statement from the suspect to be used in the prosecution's case-in-chief at trial. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). A suspect's right to counsel and right to remain silent are two of the rights protected by these procedural guidelines. *State v. Ross*, 203 Wis. 2d 66, 73, 552 N.W.2d 428 (Ct. App. 1996).

¶ 29. In order to invoke the Fifth Amendment right to counsel, a suspect is required to " 'articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.' " *State v. Jennings*, 2002 WI 44, ¶ 30, 252 Wis. 2d 228, 647 N.W.2d 142 (quoting *Davis v. United States*, 512 U.S. 452, 459 (1994)). Such a request must be "unambiguous[]." *Davis*, 512 U.S. at 459. A mere reference to an attorney is not sufficient to invoke the right. *See Jennings*, 252 Wis. 2d 228, ¶ 31. For instance, statements such as, " '[m]aybe I should talk to a lawyer,' [are] not . . . clear and unequivocal request[s] for counsel." *Id.* (quoting *Davis*, 512 U.S. at 462). " 'Unless [a] suspect *actually requests* an attorney, questioning may continue.' " *Id.* (quoting *Davis*, 512 U.S. at 461; emphasis added).

A. *Hampton did not unambiguously invoke his right to counsel at the outset of the July 20 interview.*

¶ 30. Hampton alleges that detectives ignored him and continued to inappropriately question him five minutes into the July 20 interview, when he stated: "I really don't want to say nothing. I don't have no lawyer.

547

And understand, like I said, he [Detective Peterson] told me to say nothing." Here, simply stated, Hampton did not unambiguously request counsel. Instead, he merely stated a fact: that he did not have an attorney. At best, the statement suggests that Hampton *might* want counsel, but that is not enough to invoke his right to one under the Fifth Amendment. *See id.* Hampton was required to do more and detectives did not err in continuing to question him. *See id.*

B. *Hampton waived his Miranda rights after they were read to him during the July 20 interview.*

■

¶ 31. Next, we address Hampton's claim that he did not orally waive his *Miranda* rights when they were read to him by Detective Heier. He bases his argument entirely on the fact that his response when Detective Heier asked him if he was willing to talk is indistinct on the audio tape of the interview. Because an express waiver of *Miranda* is not required, and the State has otherwise demonstrated that Hampton knowingly and intelligently waived his rights, we affirm the circuit court.

■ ■

¶ 32. "The main purpose of [reading an accused the] *Miranda* [rights] is to ensure that an accused is advised of and understands the right to remain silent and the right to counsel." *Berghuis v. Thompkins*, ___ U.S. ___, 130 S. Ct. 2250, 2261 (2010). It is the State's burden to demonstrate by a preponderance of the evidence that the accused knowingly and intelligently waived his or her *Miranda* rights. *Id.* at 2261. But the State "does not need to show that a waiver of *Miranda* rights was express." *Id.* Rather, "[a]n 'implicit waiver' of the 'right to remain silent' is sufficient to admit a

suspect's statement into evidence." *Id.* (citation omitted). The State establishes an "implicit waiver" when it demonstrates that "a *Miranda* warning was given and that it was understood by the accused" and that the accused then went on to make an uncoerced statement. *Id.* at 2262.

¶ 33. Here, the audio tape demonstrates that after Detective Heier read Hampton the *Miranda* rights Hampton answered "yes, sir" when asked if he understood those rights. Moreover, the record shows that Hampton had been read his *Miranda* rights on previous occasions and was familiar with those rights prior to when they were read to him by Detective Heier. In short, there is ample evidence that Hampton was read his rights and understood them.

¶ 34. Additionally, Hampton's statements to Detective Heier were not coerced. Nor does Hampton argue that they were. While the audio tape does not demonstrate, what, if anything, Hampton said immediately after Detective Heier asked him if he wanted to talk to the detectives, Hampton's subsequent statements demonstrate a willingness to talk. Throughout the interrogation, Detective Heier repeatedly told Hampton that Hampton was "in charge" and that Hampton could stop the questioning whenever he wanted to, "pick and chose" the questions he wished to answer, or talk to a lawyer. Hampton's decision to continue answering questions, knowing his rights, amounts to an implicit waiver of his *Miranda* rights.

¶ 35. Furthermore, Hampton expressly waived his *Miranda* rights minutes after being asked by Detective Heier whether he wanted to talk, when Hampton stated: "I want to talk." His express waiver came after he acknowledged understanding his rights, and after he asked and received clarification about those rights,

asking: "Do I got to talk to both of you all? Or can I just talk to one of you all? . . . I'm supposed to be talking to Mark [Detective Peterson]." After Detective Heier explained that he and his partner would both be questioning Hampton, and that Detective Peterson would not be present, Hampton, knowing his rights, decided to continue talking to the detectives, telling detectives: "I want to talk."

¶ 36. Consequently, we conclude that Hampton did waive his *Miranda* rights during the July 20 interview.

*C. While Hampton unambiguously invoked his right to counsel two hours and thirty-eight minutes into the July 20 interview, he then immediately initiated further communication with the detectives and then waived his right to counsel.*

■■■

¶ 37. Finally, Hampton contends that detectives violated his Fifth Amendment right to counsel when, two hours and thirty-eight minutes into the July 20 interview, he requested counsel and Detective Heier purportedly continued his interrogation. Hampton argues that after he requested to speak with counsel Detective Heier failed to immediately terminate questioning, and instead, asked Hampton if there was "[a]ny specific lawyer you want us to call?" Hampton further contends that he did not initiate communication with the detectives after asserting his right to counsel. We disagree.

¶ 38. Indeed, Hampton did unambiguously request an attorney two hours and thirty-eight minutes into the first interview, stating, "I'm not trying to be rude or nothing. I just want to talk to a lawyer." Once an accused invokes his right to counsel under the Fifth Amendment, "the accused 'is not subject to further

*interrogation* by the authorities until counsel has been made available to him [or her].'" *State v. Lagar*, 190 Wis. 2d 423, 431, 526 N.W.2d 836 (Ct. App. 1994) (citation omitted). However, that does not mean that all *questioning* must end. *Id.* "[O]nce the accused clearly invokes the right to counsel, interrogation must cease; however, the police can ask simple questions with the goal of insuring that the accused is provided with counsel." *Id.* at 432. Detective Heier's question, "[a]ny specific lawyer you want us to call?," falls squarely within the rule set forth in *Lagar* because it was meant to ensure that the detectives could effectively execute Hampton's right to talk to an attorney.

¶ 39. After Hampton informed Detective Heier that he did not have a particular attorney in mind, Detectives Heier and Jacks immediately ended the interview and began collecting their things to leave. As the circuit court noted: "And then there's another pause of several seconds [on the audio tape] and then there's a sound of [a] chair scraping and papers being collected, and I believe you hear a door open and it seems quite clear that the officers kind of abruptly get up and leave." Because Hampton does not challenge that finding and because it appears to comport with the noises on the audio tape, we uphold that finding as true and therefore conclude that immediately following Hampton's request for counsel, the detectives appropriately terminated their interrogation.

¶ 40. Our analysis, however, does not end there. "Even after a suspect in custody asks to speak with a lawyer, thereby requiring that 'all interrogation must cease until a lawyer is present,' a suspect may waive his or her Fifth Amendment *Miranda* right to counsel." *State v. Hambly*, 2008 WI 10, ¶ 67, 307 Wis. 2d 98, 745

N.W.2d 48 (footnotes and citations omitted). However, the burden is on the State to demonstrate that: (1) the suspect " 'initiate[d] further communication, exchanges, or conversations with the police' "; and (2) the suspect's subsequent waiver was made " 'voluntarily, knowingly and intelligently.' " *Id.*, ¶¶ 68–70 (brackets in *Hambly*; footnotes and citations omitted). Hampton argues that he did not initiate further communication with detectives after asking for counsel.

¶ 41. The Supreme Court, in *Oregon v. Bradshaw*, 462 U.S. 1039 (1983), set forth two different tests for determining whether a suspect has initiated a discussion or conversation with law enforcement officers. First, the four-justice *Bradshaw* plurality concluded that a suspect initiates communication when he or she asks questions or makes statements "that under the totality of the circumstances 'evince[] a willingness and a desire for a generalized discussion about the investigation.' " *Hambly*, 307 Wis. 2d 98, ¶ 73 (citing *Bradshaw*, 462 U.S. at 1045–46). Second, the four-justice *Bradshaw* dissent argued that the suspect must instigate " 'dialogue about the subject matter of the criminal investigation.' " *Hambly*, 307 Wis. 2d 98, ¶ 74 (citing *Bradshaw*, 462 U.S. at 1053 (Marshall, J., dissenting)) (emphasis omitted).

¶ 42. Here, after Hampton requested to speak with an attorney, the detectives scrupulously respected that request and began to leave. Hampton then asked the detectives if they were leaving. Detective Heier answered appropriately, explaining to Hampton that he had a right to speak with counsel and because he invoked that right the detectives were going to end their questioning, stating: "Yeah. If you wanna talk to a lawyer, we're not going to talk to you . . . . You're in charge . . . . If you want a lawyer, I respect that and I'll honor that." Hampton later told the detectives, "I really do want to talk to you guys . . . . I just need some time."

¶ 43. Under either test set forth in *Bradshaw*, the culmination of Hampton's statements with detectives from "I just don't want you guys to leave right now" and ending with "I really do want to talk to you guys," demonstrates an initiation of communication with the detectives. It is reasonable to conclude that Hampton wished to continue talking about the circumstances surrounding Stovall's death, as that had been the focus of his conversation with the detectives for several hours. Detectives honored Hampton's request for a thirty to forty minute break to read the Bible and pray before continuing to speak with detectives, and Detective Heier reread Hampton his *Miranda* rights before continuing to interrogate him an hour later. At that time, Hampton acknowledged that he understood his rights and expressly waived them before talking with the detectives.

¶ 44. Therefore, although Hampton did ask to speak with a lawyer, we conclude that detectives honored that request until Hampton initiated further communication with the detectives and Hampton again waived his *Miranda* rights.

## III. Fifth Amendment Right to Remain Silent[8]

¶ 45. Finally, we address Hampton's argument that the detectives violated his Fifth Amendment right to remain silent when they failed to end the July 20

---

[8] We note that Hampton did not argue before the circuit court that he invoked his right to remain silent at any time during the July 20 and 21 interviews. However, because the audio tapes provide a complete record of what transpired during the interviews and because the parties have briefed the relevant issues, we chose to address the merits of the issue on appeal. *See State v. Sveum*, 2010 WI 92, ¶ 40, 328 Wis. 2d 369, 787 N.W.2d 317 (stating that the waiver rule is one of judicial administration and does not limit the power of an appellate court in a proper case to address issues not raised in the circuit court).

interview after Hampton purportedly asserted his right to remain silent at the outset of the interview.

¶ 46. A suspect's Fifth Amendment right to remain silent includes two separate protections: (1) the right, prior to questioning, to remain silent unless the suspect chooses to speak in the unfettered exercise of his or her own will, *see Miranda*, 384 U.S. at 460; and (2) the right to cut off questioning, *Michigan v. Mosley*, 423 U.S. 96, 103 (1975). "Through the exercise of [a suspect's] option to terminate questioning he [or she] can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." *Id.* at 103–04. Like the right to counsel, a suspect is required to unambiguously invoke his or her right to remain silent. *See Ross*, 203 Wis. 2d at 70. This means:

> A suspect must, by either an oral or written assertion or non-verbal conduct that is intended by the suspect as an assertion and is reasonably perceived by the police as such, inform the police that he or she wishes to remain silent . . . .
>
> Further, given an equivocal or ambiguous request to remain silent, the police need not ask the suspect clarifying questions on that request.

*Id.* at 78 (citations and footnote omitted).

¶ 47. Hampton contends that he asserted his Fifth Amendment right to remain silent when he made the following statement during the first five minutes of the July 20 interrogation:

> He [Detective Peterson] told me to talk to nobody but him . . . . I know how this stuff go, OK. I really don't want to say nothing . . . . And understand, like I said, he told me to say nothing . . . . I know how it go. Good cop, bad cop . . . . He told me to talk to him.

This statement did not sufficiently invoke Hampton's right to remain silent.

¶ 48. Reviewing his statement in context, " 'a reasonable [detective] in the circumstances would understand the statement to be' " a desire to speak only to Detective Peterson and not a desire to end questioning all together. *Id.* (citation omitted). Hampton's desire to speak to a specific detective is not an invocation of the right to remain silent. *See State v. Owen*, 202 Wis. 2d 620, 641, 551 N.W.2d 50 (Ct. App. 1996) ("The declaration that [the suspect] did not wish to speak to a specific officer is not the invocation of his right to remain silent."). And detectives were not obligated to ask Hampton for clarification. *See Ross*, 203 Wis. 2d at 78.

¶ 49. Consequently, because Hampton did not invoke his right to remain silent, and because (as we concluded previously) Hampton waived his *Miranda* rights, we affirm the circuit court.

**IV. July 21 Interview**

¶ 50. In conclusion, because we conclude that Hampton's Fifth and Sixth Amendment rights were not violated during the July 20 interview, and because Hampton concedes that he was properly read his *Miranda* rights and waived them before confessing to killing Stovall on July 21, we need not address whether the July 21 interview was sufficiently attenuated from the July 20 interview. All of the statements were properly admissible.

*By the Court.*—Judgment affirmed.