STATE of Wisconsin,Plaintiff-Respondent,

v.

Stanley K. BULLOCK, Defendant-Appellant.†

Court of Appeals

*No. 2013AP453–CR. Submitted on briefs January 7, 2014.
—Decided February 18, 2014.*

2014 WI App 29

(Also reported in 844 N.W.2d 429.)

† Petition for Review denied June 12, 2014.

202

On behalf of the defendant-appellant,the cause was submitted on the brief of *Mark S. Rosen* of *Rosen and Holzman,* of Waukesha.

On behalf of the plaintiff-respondent,the cause was submitted on the brief of *J.B. Van Hollen,* attorney general, and *Gabe Johnson-Karp,* assistant attorney general.

Before Curley, P.J., Fine and Brennan, JJ.

¶ 1 CURLEY, P.J.   Stanley K. Bullock appeals the judgment convicting him of first-degree reckless homicide, contrary to Wis. Stat. § 940.02(1) (2011–12).[1] He also appeals the order denying his motion to suppress two statements made to police:   one while being transported from the scene of the crime to the hospital; and another made in his hospital room while he was being treated for extensive injuries. Bullock argues that the trial court erred in denying his motion to suppress because neither of these statements was voluntary. We disagree and affirm.

## BACKGROUND

### A.   Nature of the Case

¶ 2.   Bullock was charged with first-degree intentional homicide for the stabbing death of his girlfriend, D.K. Bullock's version of events, as alleged in the criminal complaint, was that unknown masked attackers broke into the couple's apartment and stabbed Bullock and D.K., ultimately killing D.K. The remainder of the facts alleged in the complaint told a different story.

¶ 3.   According to the complaint, the firefighters and investigators who responded to Bullock's 9-1-1 call for medical help on January 21, 2011—a call in which Bullock stated that he had been stabbed, but made no mention of his girlfriend—noticed a number of suspicious facts. They found Bullock fully conscious with lacerations to his stomach, left wrist, and neck, and a

---

[1] All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

puncture wound on his right abdomen. None of Bullock's wounds was actively bleeding, and there was a substantial amount of dried blood on Bullock and throughout the house. One of the paramedics noted with suspicion that Bullock's wounds seemed to be symmetrical on both sides of his body, as though they had been self-inflicted. Beside the bed, covered with blankets and pillows, firefighters discovered the body of D.K., which was cold to the touch. Subsequent investigation revealed no sign of forced entry, no footprints in the snow on the upper porch, and no blood outside the apartment. Inside the apartment, investigators found a thirteen-inch knife, smeared with blood, stashed between the couch and a storage container. Later analysis showed that the DNA found on both the handle and the blade of the knife matched Bullock's DNA.

¶ 4. Additionally, the complaint alleged that the neighbors heard an "extremely loud" argument coming from Bullock's apartment beginning the evening of January 19, 2011, and continuing into the early morning hours of January 20, 2011. D.K.'s sister V.K., who lived next door to Bullock and D.K., heard D.K. tell Bullock that he could at least pay a $25 bill because he was living off her. Similarly, one of D.K.'s cousins told police that D.K. called him at about 11:00 p.m. the night of January 19, 2011, and told him that she thought something was wrong. D.K. told her cousin that Bullock did not want to leave the apartment, even though she asked him to do so. D.K.'s cousin recalled D.K. saying that she wanted Bullock "out of the house because she [was] clothing and feeding him," and that he had "no job and was not bringing any money into the household."

*B. Bullock's Statements to Police*

¶ 5. Bullock gave two statements to police that are the subject of this appeal.

¶ 6. Bullock gave the first statement while he was being transported from his apartment to the hospital. Milwaukee Police Officer James Phelps accompanied Bullock. During the ride from the apartment to the hospital, Bullock muttered, "my girlfriend, my girlfriend." When Officer Phelps asked Bullock whether his girlfriend had caused his injuries, Bullock replied "no, no, no," and gave his account of the masked attackers. Officer Phelps testified that at the time of the transport, he considered Bullock a victim rather than a suspect, and was trying to ascertain how Bullock's injuries occurred. Bullock was not under arrest.

¶ 7. Bullock gave his second statement on the evening of January 21, 2011, while he was still at the hospital and taking medication for pain and blood pressure. Bullock spoke with Milwaukee Police Detectives Rodney Young and Erik Gulbrandson. After Bullock agreed to make statements to the detectives, Detective Gulbrandson began audio recording the discussion. Bullock was read his *Miranda* rights,[2] after which he provided his account of the evening of D.K.'s death. Bullock stated that, after going out to dinner on Wednesday night, January 19, he and his girlfriend drank some wine, used some marijuana and cocaine, and went to bed around 4:00 a.m. on Thursday morning. Bullock claimed that, sometime after going to bed, he was awakened by two or three masked men who attacked him and D.K. Bullock stated that after the attack he faded in and out of consciousness throughout the next day, but that he recalled hearing D.K. say, "I

---

[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

don't want to die," at which point Bullock crawled to the bathroom and passed out. Later, when he came to, Bullock crawled back to the bedroom and found D.K. lying on the floor and shaking. Bullock then passed out again, regained consciousness, and called 9-1-1 to report that he had been stabbed.

## C. Motion to Suppress

¶ 8. After he was charged, Bullock moved to suppress his statements to Officer Phelps and Detectives Young and Gulbrandson on the ground that, due to his injuries, they were not made voluntarily. Additionally, Bullock argued that the statement he gave to Detectives Gulbrandson and Young should be suppressed because the detectives failed to record three minutes of preliminary discussion that occurred in Bullock's hospital room before the interrogation.

¶ 9. The trial court denied the motion to suppress. The trial court first held that there was no *Miranda* violation regarding the statement Bullock made to Officer Phelps because the statement was not made while Bullock was under arrest or in custody. Rather, Bullock "at the time was being treated as a potential victim." The trial court then held that the statement Bullock made to Detectives Young and Gulbrandson would not be suppressed because under the totality of the circumstance it was voluntarily made.

¶ 10. Regarding Bullock's second statement, the trial court explained that while the recording indicated that Bullock was in pain during the beginning of the interview, Bullock sounded much better as the interview went on, and that he appeared to understand the questions asked him and gave detailed answers:

I did, as I stated, listen to the [recording] itself. And

I did hear the rights read, the *Miranda* warnings read. I heard Mr. Bullock indicate that he understood his rights, and he was asked if it was okay if he wanted to talk about it.

He was asked if it was all right if they talk about what happened, is he okay with that; and he said yes.

I will say that at the beginning of the interview it appeared that Mr. Bullock was a little quieter, appeared to be—I would say there was a little bit of—kind of—I mean, you could tell I think from listening to it that he was in some pain.

The question specifically during the interview where Detective Gulbrandson did ask Mr. Bullock to let them know if he was in a lot of pain. I think there was a definite effort made on the detectives to ask about it and to make sure that the pain was not too much.

I did hear the suctioning sounds a couple . . . [of] times . . . so it does appear that [there] was mucus or saliva that was suctioned out.

But I'll also say that as the interview went on, Mr. Bullock sounded better. He sounded more animated. He really did sound better.

The more it went into the interview, I'd say in 30 minutes in, 40 minutes in, he was answering every question appropriately. He gave detailed answers to questions. He did not complain about too much pain.

[Defense counsel] referred to some moaning. There was a little bit at the beginning. But I would say overall, if I didn't know that he was in the hospital, by the time we were in the middle of this interview, other than the suction sound and the beeping, I don't know that I would have known that.

I think that Mr. Bullock, he never asked for an attorney, never said to stop; and he answered each

question appropriately with detailed answers, [was] responsive, [and] appeared to understand what was going on.

¶ 11.  The trial court also found, with regard to the second statement, that "[t]here were no threats made," nor any raised voices, "[n]or any kind of indication of any kind of pressure put on him by the officers."

¶ 12.  Regarding Bullock's argument about the three minutes of unrecorded discussion preceding the hospital interview, the trial court concluded that the failure to record this preliminary discussion did not warrant suppression because there was no interrogation during that time. Rather, the three minutes were "a kind of preface to determine whether or not [Bullock] was capable of talking to [police] before giving the *Miranda* warnings."

¶ 13.  After his motion to suppress was denied, Bullock pled guilty to first-degree reckless homicide, admitting that he stabbed D.K., but claiming that she pulled the knife on him first. Bullock now appeals. Additional facts will be developed as necessary.

## ANALYSIS

¶ 14.  On appeal, Bullock argues that the trial court erred in denying his motion to suppress because neither his statement to Officer Phelps nor his statement to Detectives Young and Gulbrandson was voluntary. "Ordinarily, a guilty plea waives all nonjurisdictional defects and defenses." *State v. Hampton*, 2010 WI App 169, ¶ 23, 330 Wis. 2d 531, 793 N.W.2d 901, *rev. denied*, 2011 WI 29, 332 Wis. 2d 279, 797 N.W.2d 524. However, "[a] narrowly crafted exception to this rule exists" "which permits appellate review of an order

denying a motion to suppress evidence, notwithstanding a guilty plea." *See id.* We review the denial of Bullock's motion to suppress under a two-part standard of review: we uphold the trial court's findings of fact unless they are clearly erroneous, but review *de novo* whether those facts warrant suppression. *See id.*

¶ 15. "A defendant's statements are voluntary if they are the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist." *State v. Hoppe*, 2003 WI 43, ¶ 36, 261 Wis. 2d 294, 661 N.W.2d 407. To determine whether a defendant's statements are voluntary, we apply a "totality of the circumstances" test. *See id.*, ¶ 38. "The totality of the circumstances analysis involves a balancing of the personal characteristics of the defendant against the pressures imposed upon the defendant by law enforcement officers." *Id.* The personal characteristics of the defendant that we consider "include the defendant's age, education and intelligence, physical and emotional condition, and prior experience with law enforcement." *See id.*, ¶ 39. The pressures imposed by police "to induce the statements" include:

> the length of the questioning, any delay in arraignment, the general conditions under which the statements took place, any excessive physical or psychological pressure brought to bear on the defendant, any inducements, threats, methods or strategies used by the police to compel a response, and whether the defendant was informed of the right to counsel and right against self-incrimination.

*Id.* Moreover, in balancing a defendant's personal char-

211

acteristics against police pressures, we must keep in mind "that the amount of police pressure that is constitutional is not the same for each defendant." *See id.*, ¶ 40; *see also Mincey v. Arizona*, 437 U.S. 385, 401 ("Determination of whether a statement is involuntary 'requires more than a mere color-matching of cases.' It requires careful evaluation of all the circumstances of the interrogation.") (citation and internal citation omitted).

█

¶ 16.   Specifically, with regard to his statement to Officer Phelps, Bullock points to three factors that he claims show that his statement was involuntary: (1) his physical injuries were described as "extensive;" (2) he was somewhat disoriented; and (3) despite these facts, Officer Phelps continued to question him anyway. Bullock claims that his physical condition and Officer Phelps' decision to ask him questions, despite his injuries and disorientation, is analogous to circumstances surrounding police questioning of a hospitalized man that the United States Supreme Court found improper in *Mincey*.

█

¶ 17.   Similarly, with regard to his statement to Detectives Gulbrandson and Young, Bullock sets forth several factors that he claims place the circumstances surrounding his statement in line with—or even more egregious than—*Mincey*:   (1) he was questioned by two detectives, instead of one; (2) he was in the hospital's intensive care unit and taking medications for his pain, and he made moaning sounds due to his pain; and (3) he could not tell the detectives what day it was.

¶ 18.   We disagree with Bullock regarding both statements. Bullock highlights only a few of the numerous factors we must consider in weighing the totality of

the circumstances of his statements. *See Hoppe*, 261 Wis. 2d 294, ¶¶ 38–39. Evaluating all of the circumstances the law requires us to consider leads us to conclude that Bullock's statements to Officer Phelps and Detectives Gulbrandson and Young were voluntarily made. Moreover, as we will explain below, *Mincey* is inapposite.

¶ 19.   Turning first to Bullock's personal characteristics, *see Hoppe*, 261 Wis. 2d 294, ¶ 39, while Bullock's injuries were described by Officer Phelps as "extensive," and while Bullock did make moaning sounds due to his pain at the beginning of the hospital interview, there is no indication that the pain interfered with his ability to speak with law enforcement in these particular circumstances, *see id.*, ¶ 36; *see also State v. Clappes*, 136 Wis. 2d 222, 240, 401 N.W.2d 759 (1987) ("the mere existence of pain . . . is insufficient to render a statement involuntary"). While Bullock makes much of the fact that he did not know what day it was when being questioned at the hospital, he does not dispute the trial court's finding that he generally answered questions appropriately and in detail.

¶ 20.   Bullock also ignores the other factors showing that he was in fact able to comprehend the detectives' questions and that his statement was "the product of a free and unconstrained will." *See Hoppe*, 261 Wis. 2d 294, ¶ 36. For example, at the time of the offense Bullock was forty-five years old, *see, e.g., In re Jerrell C.J.*, 2005 WI 105, ¶¶ 25–26, 283 Wis. 2d 145, 699 N.W.2d 110 (age is generally more important when the defendant is a minor), had completed eleven years of schooling, and held a GED. Bullock points to no facts showing that he possessed anything less than average intelligence. In addition, Bullock's familiarity with the

213

criminal justice system made him less vulnerable to any alleged police pressures. *See Hoppe*, 261 Wis. 2d 294, ¶ 39. Bullock was initially arrested at the hospital for an outstanding warrant in an unrelated retail theft case, and—as the State correctly points out in its response brief—a search for Stanley K. Bullock (with the same birth date) on the Wisconsin Circuit Court Access database shows that at the time he was questioned by police in 2011, Bullock previously had been charged with other crimes.[3]

---

[3] Bullock did not file a reply brief and therefore did not respond to the State's statement that he had been charged with other crimes prior to his arrest in the instant case. Consequently, Bullock has waived his right to dispute this fact. *See State v. Chu*, 2002 WI App 98, ¶ 41, 253 Wis. 2d 666, 643 N.W.2d 878.

Bullock later filed a motion for reconsideration regarding this issue. In his motion, Bullock did *not* argue that he had never been previously arrested. Instead, citing *State v. Bonds*, 2006 WI 83, 292 Wis. 2d 344, 717 N.W.2d 133, and *Sisson v. Hansen Storage Co.*, 2008 WI App 111, 313 Wis. 2d 411, 756 N.W.2d 667, Bullock argued that we improperly relied on CCAP records as proof that he had previously been arrested. We again stress that Bullock has waived his right to make this argument as he declined to file a reply brief, and we will not address it. *See Chu*, 253 Wis. 2d 666, ¶ 41.

Nevertheless, we observe that while *Bonds* holds that CCAP records may not constitute *prima facie* evidence of a defendant's status as a repeat offender, it does not prohibit a court from using CCAP to determine whether a defendant has previously been arrested. *See id.*, 292 Wis. 2d 344, ¶¶ 53–54. Moreover, *Sisson*, citing Wis. Stat. Rule 902.01(2)(b), states that we may take judicial notice of any " 'fact capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' " *See Sisson*, 313 Wis. 2d 411, ¶ 10 (citing Wis. Stat. Rule 902.01(2)(b)). Surely whether Bullock had been previously arrested is such a fact.

¶ 21. Turning next to "the pressures imposed by police," *see id.*, we conclude that the record is devoid of any information that would lead us to conclude that the police officers who questioned Bullock acted improperly. Bullock does not argue that the length of questioning was improper, not does he argue that there was any delay in arraignment. *See id.* As for the general conditions under which he gave his statements, Bullock takes issue with the fact that *two* detectives questioned him at the hospital, but that fact, without more, is not enough to evince coercion. *See Clappes*, 136 Wis. 2d at 234 (reversing an earlier court of appeals decision that held "that the mere presence of police . . . may impermissibly pressure the individual to make a statement against his or her will") (citation omitted).[4] In addition, Bullock does not argue that he should have been read his *Miranda* rights before giving his statement to Officer Phelps, nor does he argue that he did not understand the *Miranda* warnings given by Detectives Gulbrandson and Young in his hospital room.

¶ 22. Most importantly, notwithstanding his implicit—and incorrect—assertion that merely talking with him was coercive, Bullock does not argue that police actually engaged in any coercive tactics. Rather, as the trial court found, and as Bullock does not refute, "[t]here were no threats made," nor any raised voices, "[n]or any kind of indication of any kind of pressure put on him by the officers." This last point forms the lynchpin of our analysis, as our supreme court has clearly held "that in order to justify a finding of involuntariness, there must be some affirmative evidence of

---

[4] We note that, due to his outstanding retail theft warrant, Bullock was handcuffed to his hospital bed and a police guard was stationed outside his room. Bullock does not argue that these measures were improper or coercive.

improper police practices deliberately used to procure" a statement. *See Clappes*, 136 Wis. 2d at 239; *see also Colorado v. Connelly*, 479 U.S. 157, 164 (1986) ("Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.").

¶ 23. Furthermore, neither Bullock's personal characteristics nor the actions of police in this case mirror the facts of *Mincey*, the case on which Bullock primarily relies to support his contentions. First, the physical condition of the defendant in *Mincey* was far worse; indeed, the Supreme Court described him as "seriously and painfully wounded . . . on the edge of consciousness." *See id.*, 437 U.S. at 401. The court also noted:

> [Mincey] had sustained a wound in his hip, result-ing in damage to the sciatic nerve and partial paralysis of his right leg. Tubes were inserted into his throat to help him breathe, and through his nose into his stom-ach to keep him from vomiting; a catheter was inserted into his bladder. He received various drugs, and a device was attached to his arm so that he could be fed intravenously. He was then taken to the intensive care unit . . . . Mincey was unable to talk because of the tube in his mouth, and so he responded to Detective Hust's questions by writing answers on pieces of paper pro-vided by the hospital.

*See id.* at 396 (some formatting altered). Second, unlike Officer Phelps and Detectives Gulbrandson and Young, the police officer who questioned Mincey undoubtedly coerced Mincey into giving a statement. For example, although Mincey stated numerous times that he did not want to speak without having a lawyer present, *see id.* at 400, nn.16–17, the interrogating officer continued to

question him, *see id.* at 396. Also, notwithstanding Mincey's protestations, a nurse present in Mincey's room during the interrogation urged Mincey that "it would be best" if he would answer the officer's questions. *Id.* at 399. And, although Mincey told the officer multiple times that he was "confused or unable to think clearly," the officer pressed Mincey to continue— ultimately questioning him for almost four hours. *Id.* at 396, 400. No such misconduct occurred in Bullock's case.

¶ 24. Finally, we will not consider Bullock's unsupported argument that during the three minutes of unrecorded preliminary discussion that occurred in Bullock's hospital room police utilized coercive tactics. Bullock argues that during these three minutes, "the police utilized whatever method(s) necessary in order to 'convince' the Defendant to cooperate in his weakened and highly vulnerable condition. The Detectives sought to 'hide' this conversation by making the conscious choice not to record the first three minutes of their interview with the Defendant." Bullock does not, however, provide a single fact to support this contention. We will therefore not consider it. *See State v. McMorris,* 2007 WI App 231, ¶ 30, 306 Wis. 2d 79, 742 N.W.2d 322 ("we may choose not to consider arguments unsupported by references to legal authority, arguments that do not reflect any legal reasoning, and arguments that lack proper citations to the record").[5]

¶ 25. In sum, the totality of the circumstances shows that Bullock's statements were "the product of a free and unconstrained will, reflecting deliberateness of

---

[5] We further remind Bullock's appellate counsel that the rules of appellate procedure require parties to support their arguments with facts from the record. *See* WIS. STAT. Rule 809.19(1)(e).

choice." *See Hoppe*, 261 Wis. 2d 294, ¶ 36. We therefore conclude that the trial court properly denied Bullock's motion to suppress.

*By the Court.*—Judgment and order affirmed.