STATE of Wisconsin,
Plaintiff-Respondent,

v.

Jeremiah R. POPP,
Defendant-Appellant.

STATE of Wisconsin,
Plaintiff-Respondent,

v.

Christopher A. THOMAS,
Defendant-Appellant.

Court of Appeals

*Nos. 2013AP1916–CR, 2014AP166–CR.*
*Submitted on briefs September 2, 2014.*
*—Decided September 30, 2014.*

2014 WI App 100

(Also reported in 855 N.W.2d 471.)

On behalf of the defendant-appellant Jeremiah Popp, the cause was submitted on the briefs of *Amelia L. Bizzaro* of *Bizzaro Law, LLC,* of Milwaukee.

On behalf of the defendant-appellant Christopher A. Thomas, the cause was submitted on the briefs of *Benjamin James Peirce* of Wauwatosa.

On behalf of the plaintiffs-respondents Jeremiah Popp and Christopher A. Thomas, the cause was submitted on the briefs of *J.B. Van Hollen,* attorney general, and *Christine A. Remington,* assistant attorney general.

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. CURLEY, P.J.  In these consolidated appeals, Jeremiah R. Popp and Christopher A. Thomas appeal the judgments convicting each of them of one count of manufacturing or delivering 100 grams or less of psilocin or psilocybin, contrary to WIS. STAT. § 961.41(1)(g)1. (2011–12).[1] Thomas and Popp pled guilty after the trial court denied their motions to suppress evidence, including mushrooms and mushroom-growing materials, that

---

[1] Popp was charged and convicted in Milwaukee County Circuit Court Case No. 2012CF1683 and Thomas was charged and convicted in Milwaukee County Circuit Court Case No. 2012CF1684. The circuit court considered requests from both defendants to suppress evidence together, held one hearing addressing both motions, and issued one oral ruling denying

was discovered after police executed a search warrant for their trailer home.[2] On appeal, Thomas and Popp argue that the trial court erred in denying their motions to suppress because the warrant was invalid. Specifically, they contend that the primary basis for the warrant—observations made by police when they trespassed on the defendants' property and peered into their windows—resulted from an illegal search, and further, that when the illegally-obtained observations are excised from the affidavit made in support of the warrant, there is no probable cause. We agree, and therefore reverse the convictions and remand the cases to the trial court for further proceedings consistent with this opinion.

### BACKGROUND

¶ 2. We derive much of the background information from the trial court's findings of fact at the suppression hearing, as well as from the police affidavit submitted in support of the search warrant. The facts of this case are not in dispute.

¶ 3. On February 21, 2012, West Allis Police Lieutenant Christopher Marks arrived at work to a voicemail message left at about 4:40 a.m. by an anonymous caller who reported an "active drug complaint" at the Hillside Trailer Court on 10211 West Greenfield Avenue. In the message, the caller said that he was watching a resident in a full body sterile suit leave the

---

both motions. On February 20, 2014, we consolidated these cases for the purposes of disposition.

All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

[2] All references to "mushrooms" in this opinion relate to psilocin or psilocybin, which are controlled substances under Wisconsin law. *See* WIS. STAT. § 961.41(1)(g).

trailer directly west of Trailer 23 and move big, blue Tupperware bins containing mushrooms from inside the trailer. There is no information relating how the caller knew that the individual moving the bins was a resident of the aforementioned trailer, nor is there any information explaining how the caller knew that there were mushrooms in the bins. What was related in the voicemail message, however, was that the caller, who did not identify himself in any way, "was looking for some kind of consideration in a different investigation outside the drug unit."

¶ 4. After hearing the message, Lieutenant Marks, along with Detective Brian Beyer, went to the trailer park to investigate. They determined that the trailer directly west of Trailer 23 was Trailer 22.

¶ 5. After determining that Trailer 22 was the trailer the caller identified, Lieutenant Marks and Detective Beyer returned to the police station to obtain more information. They learned that Trailer 22 had been the subject of a call in 2009 "regarding a possible meth lab involving Jeremiah Popp and Christopher Thomas."[3] Department of Transportation records confirmed that Trailer 22 was the address for both men.

¶ 6. Lieutenant Marks and Detective Beyer then went back to the trailer park, where they encountered Thomas and began questioning him. When Marks and Beyer first arrived, they saw Thomas standing outside, appearing to be waiting for someone. Thomas approached the officers, "stating he was waiting for someone to drop off a computer for him to fix and thinking that [the police] were that person." He was cordial with the officers until he learned that the men were police

---

[3] At that time investigators searched the trailer upon receiving consent but located no evidence of methamphetamine.

702

officers and why they were there. At that point, Thomas, who was twenty-three years old, became visibly nervous—"[h]is hands were shaking, his face became very red, his speech was slowed and softened and he wouldn't look directly at the officers." Detective Beyer told Thomas that police had information that drugs were being manufactured from his residence, and asked Thomas for consent to search the trailer. Thomas refused, saying that Popp, his domestic partner, was very upset with him for allowing police to enter the trailer in 2009 and was afraid that if he allowed them to search this time, Popp would force him to move out.

¶ 7.    Despite the fact that Thomas told the officers they could not search the trailer, the officers started snooping around the outside of the trailer anyway. Lieutenant Marks and Corporal Jeffrey Zientek, another officer who had arrived on the scene, poked around the outside of the trailer while Detective Beyer stayed with Thomas. Zientek and Marks went to the west side of the trailer, walked up the steps attached to the wall, and peered in a small, vertical window—a window the officers could not have seen into from the road. Using a flashlight to see into this window, Marks saw what appeared to be an oxygen tank on the floor and reflective paper wrapping of some sort in glass beakers. Zientek saw an oxygen tank, some glass tubing, and a "reflective barrier with light shining off of it." They also went to the north end of the trailer, where there was a large bay window with three sections, and walked on the grass and snow right next to the window so that they could peer inside. The blinds on the left section of the window were closed, and there were sheets covering the middle and right sections, but the officers, being as close to the windows as they were, were able to observe the inside of the trailer through

some portions of the blinds that were not functioning properly. Through the north window Marks saw, among other things, "some tinfoil that had some . . . circular indentations as though they were on top of jars and a surgical mask." Zientek, in addition to seeing the foil and jars, also "saw a mask like a doctor or nurse would wear."

¶ 8.　Lieutenant Marks surmised that there was "some sort of grow operation or lab inside" the trailer and told Detective Beyer as much in Thomas's presence. The police then questioned Thomas about the oxygen tank, and Thomas explained he liked to breathe oxygen. The police continued asking Thomas questions about the items they saw in the house, at which point Thomas asked if he was being detained. Detective Beyer told Thomas that he was free to go, but that police would be applying for a search warrant. Thomas then left the scene without returning to the trailer.

¶ 9.　Thereafter, Corporal Zientek stayed with the trailer while Detective Beyer and Lieutenant Marks returned to the police station to continue their investigation and to draft a search warrant. While Beyer and Marks were at the station, at about 2:30 p.m., the anonymous caller phoned and spoke to Beyer. Although it appears from the search warrant that the anonymous caller who called the second time was the same as the person who called early in the morning, Beyer testified that the caller provided no identifying information, nor did the caller raise the issue of consideration. The caller said he had been in Trailer 22 "millions" of times and had personally observed a mushroom grow operation there.

¶ 10.　The officers obtained a search warrant, and, upon execution of the warrant, discovered a lab for the creation of mushrooms as well as mushrooms in various

stages of growth. Consequently, the State charged Popp and Thomas each with one count of manufacture of more than 100 but not more than 500 grams of psilocin or psilocybin as party to a crime, contrary to WIS. STAT. §§ 961.41(1)(g)2., 939.05.

¶ 11. Thomas and Popp both challenged the search. They argued that the primary basis for the search warrant, the officers' observations, resulted from an illegal search and the anonymous caller was unreliable and untrustworthy. They further argued that if the illegally obtained information was excised from the affidavit in support of the warrant, there would be no probable cause to support a search warrant.

¶ 12. After an evidentiary hearing, the trial court denied the defendants' motions. Popp and Thomas each subsequently pled guilty to one count of manufacturing or delivering 100 grams or less of psilocin or psilocybin, contrary to WIS. STAT. § 961.41(1)(g)1. Their appeals follow.

## ANALYSIS

¶ 13. On appeal, Thomas and Popp challenge the trial court's denial of their motions to suppress the evidence obtained from their trailer. "Ordinarily, a guilty plea waives all nonjurisdictional defects and defenses." *State v. Hampton*, 2010 WI App 169, ¶ 23, 330 Wis. 2d 531, 793 N.W.2d 901. However, "[a] narrowly crafted exception to this rule exists ... which permits appellate review of an order denying a motion to suppress evidence, notwithstanding a guilty plea." *See id.* We review the denial of the defendants' motion to suppress under a two-part standard of review: we

uphold the trial court's findings of fact unless they are clearly erroneous, but review *de novo* whether those facts warrant suppression. *See id.*

¶ 14.   Specifically, the defendants argue that because police violated their Fourth Amendment rights by trespassing on their property and the surrounding curtilage and peering into their windows, the observations resulting from that trespass should not have been used to support the search warrant. They further argue that when the illegally-obtained observations are excised from the affidavit made in support of the warrant, there is no probable cause. For the reasons that follow, we agree with Thomas and Popp.

> *(1)   The information obtained from the officers' observations while on defendants' property and the surrounding curtilage must be excised from the affidavit made in support of the search warrant because it was derived from an illegal search.*

██

¶ 15.   While the State claims in its brief that it "does not concede that the officers' actions of climbing the back stairs of the trailer and stepping onto the lawn to look through the window were unlawful infringements on [the defendants'] Fourth Amendment rights," it does not provide a single record citation, a single case citation, or a single supporting argument of any kind to persuade us that the officers' actions were in fact lawful. All it provides is a single, conclusory statement that the State does not concede that the officers' actions were unlawful. As we have often repeated, this kind of argument will not be considered on appeal. *See Charolais Breeding Ranches, Ltd. v. FPC Secs. Corp.*, 90 Wis. 2d 97, 108–09, 279 N.W.2d 493 (Ct. App. 1979).

¶ 16. We could therefore conclude without further explanation that the officers did in fact violate the defendants' Fourth Amendment rights by conducting an illegal search of their property. *See id.* We will, however, explain the reasons for our decision.

██

¶ 17. The Fourth Amendment, which establishes the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures," grants explicit protection to a special place: one's home. *See, e.g., Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013). Thus, "[w]hen the Government obtains information by physically intruding" on a person's home, "a search within the original meaning of the Fourth Amendment has undoubtedly occurred." *See id.* (citations and quotation marks omitted).

¶ 18. Fourth Amendment jurisprudence "has evolved into two seemingly different, but somewhat interrelated, methods of identifying protectable interests" relating to the home. *See Powell v. State*, 120 So. 3d 577, 582 (Fla. Dist. Ct. App. 2013). One method focuses on a person's expectation of privacy. *See Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). "Justice Harlan's concurring opinion [in *Katz*] stated the test in its most familiar form: first that a person [has] exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as reasonable." *See Powell*, 120 So. 3d at 582 (citing *Katz*, 389 U.S. at 361 (Harlan, J., concurring)) (quotation marks omitted). The other method, "known as the intrusion or trespass[] test, focuses on whether government agents engaged in an 'unauthorized physical penetration' into a constitutionally protected area." *See Powell*, 120 So.

3d at 582 (collecting cases) (citation and footnote omitted). The Supreme Court utilized the trespass method in two recent cases pertinent to our analysis here: *United States v. Jones*, 132 S. Ct. 945, 949 (2012) (holding that placing an electronic tracking device on a suspect's vehicle without consent was a trespass in violation of the Fourth Amendment); and *Jardines*, 133 S. Ct. at 1417–18 (holding that "[t]he government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment").

¶ 19.  It is important to note that a defendant claiming a Fourth Amendment violation may support his or her claim using *either* method. *See Jardines*, 133 S. Ct. at 1417 (An individual's " 'Fourth Amendment rights do not rise or fall with the *Katz* formulation.' " Rather, "[t]he *Katz* reasonable-expectations test 'has been *added to,* not *substituted for,*' the traditional property-based understanding of the Fourth Amendment, and so is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas.") (citations omitted). *See also United States v. Schmidt*, 700 F.3d 934, 937 (7th Cir. 2012) (After *Jones* was decided, "the government's warrantless trespass onto curtilage is presumptively a Fourth Amendment violation even if there is no reasonable expectation of privacy there.").

¶ 20.  Applying the intrusion or trespass standard, we conclude that Lieutenant Marks and Corporal Zientek trespassed on the defendants' property when they, without permission, went up the back steps and onto the porch on the west side of the defendants' trailer to peer into the window and when they peered into the window on the north end of the trailer. As

noted, Thomas expressly told the officers that they could not search the trailer, but the officers went up to the windows, occupied areas that were indisputably protected, *see Jardines*, 133 S. Ct. at 1414 (no question that areas "immediately surrounding" a house constitute curtilage, which "enjoys protection as part of the home itself"), and used their flashlights to peer inside, anyway. Moreover, this was not a situation where the officers went to the areas in question to simply knock on the door and ask a few questions. *See id.* at 1416 ("a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do' ") (citation omitted). As Thomas and Popp point out in their briefs, the officers walked into the yard and onto the back porch "with the sole, express purpose of peering inside . . . the windows." "They had no other reason for being in those areas," and "candidly acknowledged that they could not have seen what they saw within the trailer if they had not been standing" in the yard or on the back porch. *Cf. Jardines*, 133 S. Ct. at 1416 ("To find a visitor knocking on the door is routine . . . to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police."). Consequently, the officers conducted an illegal search of the defendants' property.

¶ 21.   Our conclusion is supported by the Supreme Court's decision in *Jones*. In *Jones*, the Supreme Court held "that the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.' " *See id.*, 132 S. Ct. at 949 (footnote omitted). The Court, citing a long history of Fourth Amendment jurisprudence "understood to embody a particular con-

cern for government trespass on the areas ('persons, houses, papers, and effects') it enumerates," *see id.* at 950, explained that " 'the officers in this case did *more* than conduct a visual inspection of [Jones'] vehicle' . . . [b]y attaching the device to the Jeep, officers encroached upon a protected area," *see id.* at 952 (citation omitted). In other words, as in the situation before us, "[t]he Government physically occupied private property for the purpose of obtaining information." *See id.* at 949.

¶ 22. Our conclusion also finds support in *Jardines*. In *Jardines*, police officers, acting on an unverified tip that marijuana was being grown in Jardines' home, approached the house with a dog trained to detect the scent of marijuana and other drugs and allowed the dog to explore the areas immediately surrounding the house, included the "base of the front door." *Id.*, 133 S. Ct. at 1413. On the basis of the officers' observations of the dog's behaviors when sniffing around the house, police obtained a search warrant and found marijuana inside the house. *Id.* The Supreme Court, holding that the use of the trained dog to investigate the house and its immediate surroundings constituted a search, said that applying the trespass test discussed in *Jones* "renders [Jardines'] case a straightforward one." *Jardines*, 133 S. Ct.. at 1414. It explained:

> The officers were gathering information in an area belonging to Jardines and immediately surrounding his house—in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner.
>
> . . . .

710

> [W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's "very core" stands "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window.

*See id.* (citations omitted). Similarly, in the case before us, the police gathered the information they required to support the search warrant "by physically entering and occupying the [curtilage] to engage in conduct not explicitly or implicitly permitted by the homeowner." *See id.*

¶ 23. Our conclusion is further supported by *Powell*, a Florida case with nearly identical facts. In *Powell*, an anonymous call led police to the defendants' trailer home, where, upon knocking on the door and receiving no response, police decided to peer into the windows. *Id.*, 120 So. 3d at 580–81. As in the case before us, the officers would not have seen any evidence of unlawful activity if they had been simply standing on the step and knocking on the door; rather, "[t]o see in the window, [police] had to stand to the left of the front door, at eye level with the window, off of the single door step," with "their faces no more than a hand's length from the window pane" and look "sharply to the right" to observe what appeared to be a number of marijuana plants in the kitchen. *See id.* at 581. The Florida District Court of Appeal found that the police unlawfully trespassed on the defendants' property when, instead of leaving the trailer after no one answered the door, they peered in the front window instead:

711

> The deputies . . . deviated from established norms by entering upon that portion of the property directly in front of the window. Nothing in their testimony or the record establishes any license to do that. The officers had to step off the front door step, move two feet to the left, and position themselves directly in front of the window, their faces no more than a foot away. At that point they were virtually within the home without breaking its close. Because they physically entered a part of the curtilage where they had no right to be for the purpose of gaining information, the intrusion test is met.

*See id.* at 585–86. Because the search violated the Fourth Amendment, the defendants' convictions, "which were based entirely on evidence obtained due to the unlawful search," were reversed.[4] *Id.* at 589.

■

¶ 24. Moreover, we are not persuaded by the State's argument that, regardless of whether the officers' snooping around the outside of the trailer was lawful, the warrant and subsequent search of the inside of the trailer were both lawful because they were "sufficiently attenuated" from the earlier search. In support of this contention, the State cites *State v. Phillips*, 218 Wis. 2d 180, 577 N.W.2d 794 (1998), a case in which our supreme court held that a defendant's voluntary consent to search his bedroom was valid even though the police's initial entry into his house, via the basement, was unlawful. *See id.* at 203–04, 212. In

---

[4] While not necessary to our analysis in this case, *see Patrick Fur Farm, Inc. v. United Vaccines, Inc.*, 2005 WI App 190, ¶ 8 n.1, 286 Wis. 2d 774, 703 N.W.2d 707 ("we decide cases on narrowest possible grounds"), we note that *Powell v. State* also concluded that the officers' behavior violated the reasonable expectation of privacy test, *see id.*, 120 So. 3d 577, 586, 589 (Fla. Dist. Ct. App. 2013).

deciding *Phillips*, the supreme court relied on the well-known rule that when "consent to search is obtained after a Fourth Amendment violation, evidence seized as a result of that search must be suppressed as 'fruit of the poisonous tree' unless the State can show a sufficient break in the causal chain between the illegality and the seizure of evidence." *Id.* at 204–05. According to the State, this rule should be applied in the defendants' case because, even if the initial search of the trailer was unlawful, the later, attenuated act of procuring a warrant was legitimate.

¶ 25.  We must reject the State's argument because it is not only illogical but completely unsupported by law. Contrary to what the State argues, the act of procuring a warrant cannot in itself legitimize the substance within the warrant. By the State's logic, police officers would be able to sneak into someone's house without permission, snoop around, find contraband, and later arrest them for it under any circumstances so long as a warrant was later procured and so long as an interval of time lapsed between the snooping and the obtaining of the warrant. This makes no sense. *Cf. Silverthorne Lumber Co., Inc. v. United States*, 251 U.S. 385, 391–92 (1920) (Allowing the Government to utilize unlawfully seized evidence not otherwise obtainable through legitimate means would "reduce[] the Fourth Amendment to a form of words."). Certainly, that is not what occurred in *Phillips*. *Phillips* involved voluntary consent obtained after an initial illegal entry into the defendant's home. It did not involve a warrant that was largely supported by illegally-obtained information.

¶ 26.  Consequently, we conclude that the police officers trespassed onto the defendants' property and conducted an illegal search when they, without permis-

sion, went up the back steps and onto the porch on the west side of the defendants' trailer to peer into the window and when they peered into the windows on the north end of the trailer. Therefore, the information obtained from the illegal search must be excised from the affidavit made in support of the search warrant. *See State v. Sveum*, 2010 WI 92, ¶¶ 34–35, 328 Wis. 2d 369, 787 N.W.2d 317.

> *(2) When the information obtained from the illegal search is excised from the affidavit made in support of the search warrant, there is no probable cause.*

¶ 27.   Having concluded that all of the information obtained from the officers' illegal search must be excised from the affidavit made in support of the search warrant, we must now turn to the affidavit's remaining allegations to determine whether they establish probable cause. *See State v. St. Martin*, 2011 WI 44, ¶ 17, 334 Wis. 2d 290, 800 N.W.2d 858 (" 'where a search warrant was issued based on both tainted and untainted evidence,' " we must analyze the untainted evidence to see if it is sufficient to establish probable cause) (citation omitted).

¶ 28.   "A search warrant may issue only on probable cause." *State v. Romero*, 20089 WI 32, ¶ 16, 317 Wis. 2d 12, 765 N.W.2d 756. In determining whether probable cause exists, we employ a "totality of [the] circumstances standard." *See id.*, ¶ 17. "The quantum of evidence required to establish probable cause to search is a 'fair probability' that contraband or evidence of a crime will be found in a particular place." *State v.*

*Hughes*, 2000 WI 24, ¶ 21, 233 Wis. 2d 280, 607 N.W.2d 621 (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). In evaluating any evidence provided by " 'persons supplying hearsay information,' " we must evaluate the veracity of the hearsay declarant as well as the "basis of the declarant's knowledge." *See Romero*, 317 Wis. 2d 12, ¶¶ 19–20 (citation omitted).

> To demonstrate a declarant's veracity, facts must be brought to the warrant-issuing officer's attention to enable the officer to evaluate either the credibility of the declarant or the reliability of the particular information furnished. A declarant's credibility is commonly established on the basis of the declarant's past performance of supplying information to law enforcement. Even if a declarant's credibility cannot be established, the facts still may permit the warrant-issuing officer to infer that the declarant has supplied reliable information on a particular occasion. The reliability of the information may be shown by corroboration of details; this corroboration may be sufficient to support a search warrant. If a declarant is shown to be right about some things, it may be inferred that he is probably right about other facts alleged.

> To demonstrate the basis of a declarant's knowledge, facts must be revealed to the warrant-issuing officer to permit the officer to reach a judgment whether the declarant had a basis for his or her allegations that evidence of a crime would be found at a certain place. The basis of a declarant's knowledge is most directly shown by an explanation of how the declarant came by his or her information. The basis of a declarant's knowledge also may be shown indirectly. The wealth of detail communicated by a declarant, for example, may be sufficient to permit an inference that the basis of the declarant's knowledge is sound.

*See id.*, ¶¶ 21–22 (footnotes omitted).

¶ 29. When the illegally-obtained information is excised from the affidavit made in support of the search warrant for the defendants' trailer, we are left with the following allegations:

- An anonymous caller called the West Allis police department on February 21, 2012 to report drug activity at the Hillside Trailer Court on West Greenfield Avenue.

- The caller provided no information identifying himself other than to say that he had an outstanding criminal warrant and that he hoped to use the information about the drug case "in consideration" for leniency in his own case.

- The caller identified the defendants' trailer—later discovered to be Trailer 22—and stated that a man in a full body suit was removing Tupperware containers containing mushrooms, but did not say who the individual in the body suit was, nor did he say how he knew that the contents of the bins were in fact mushrooms.

- The caller also later stated that he had been in Trailer 22 "millions" of times and had witnessed a mushroom-growing operation there.

- Police reviewed old department records and discovered that the trailer in question had been the subject of a call in 2009 "regarding a possible meth lab involving Jeremiah Popp and Christopher Thomas;" however, when investigators "conducted a consent search" at that time, "no evidence was located."

- Police then went to Trailer 22 and questioned Thomas, who appeared visibly nervous and agitated.

- Thomas refused to give police consent to search the trailer.

- In addition, the officers noticed that the windows of the trailer were covered.

These allegations do not provide probable cause to support a search warrant.

¶ 30.  We conclude, first, that we cannot rely on the information supplied by the anonymous caller because we cannot verify the veracity of the caller's knowledge. *See Romero*, 317 Wis. 2d 12, ¶¶ 20–21. The caller was anonymous, so there is no history showing that this caller has supplied police with reliable information in the past. *See id.*, ¶ 21. Nor are there any details police were able to corroborate beyond the fact that Trailer 22 was west of Trailer 23. While police did in fact discover that Trailer 22 belonged to Thomas and Popp and that the trailer had been the target of a previous, bogus drug investigation, none of those particular details were provided by the anonymous caller. Additionally, by the time police arrived on the scene, they were not able to corroborate the caller's story that an individual in a full body sterile suit was moving mushrooms. They saw no evidence of any Tupperware containers in plain view, nor did they obtain any other information that would have corroborated the caller's story. In sum, there was no way to infer that the anonymous caller was "probably right about" the facts alleged. *See id.*

¶ 31.  Second, the evidence for the basis of the caller's knowledge was extremely weak. *See id.*, ¶¶ 20, 22. The caller said he had been in the defendants' trailer "millions of times," but that description, without further substantiation, is little more than empty hyperbole. The caller did not say how he knew the defendants, his relationship to them, or the circumstances that brought him to the trailer in the past. In sum, the caller certainly did not demonstrate a "wealth of detail" that would have been "sufficient to permit an inference that the basis of the declarant's knowledge is sound." *See id.*, ¶ 22.

¶ 32.   Thus, given that we cannot verify the veracity and basis of knowledge for the facts derived from the anonymous caller, we are left with little more than the observations that the trailer's windows were covered and that Thomas was visibly nervous when being questioned about alleged illegal activity. This is not enough to support a search warrant. Indeed, not only does the State fail to provide us with a single example of a warrant that was declared valid upon such an incredible dearth of detail, but it is also clear that *Romero*, which the State cites to repeatedly in its brief, involved a situation where police had far greater and more reliable detail than what the West Allis police had in this case. Notably, in *Romero*, unlike the case before us, police were able to corroborate some of their informant's assertions before seeking a warrant:

> In the present case, [the informant] Mr. X predicted that a person would be waiting to meet him near the defendant's residence, that this person was named "Jaime," and that Jaime would supply cocaine to Mr. X. Law enforcement officers corroborated these assertions when they observed the defendant, Jaime Romero, emerge from the front door of his residence, motion to Mr. X to go toward the alley/garage directly behind the defendant's residence, and then proceed toward that area himself. The law enforcement officers verified that Jaime Romero lived at that address and that the substance Mr. X claimed he got from Jaime was in fact cocaine.

*See id.*, 317 Wis. 2d 12, ¶ 35. Likewise, the informant's credibility in *Romero* was also established by the fact that many of his statements were made against his penal interest. *See id.*, ¶¶ 36–37. This is in direct contrast to the case before us, where details of the

defendants' operation were offered in consideration for leniency for the informant on an unrelated charge.

¶ 33.   Consequently, we conclude that the warrant is invalid because it is not supported by probable cause. As such, the search of the defendants' trailer predicated on the warrant was illegal, and the fruits of that search must be suppressed. *See State v. Knapp*, 2005 WI 127, ¶ 22, 285 Wis. 2d 86, 700 N.W.2d 899 (" 'Evidence obtained as a direct result of a violation of a constitutional right . . . is inadmissible.' ") (citation omitted; ellipses in *Knapp*).

¶ 34.   Accordingly, we reverse the decisions of the trial court denying the defendants' motions to suppress and remand the cases to the trial court for further proceedings consistent with this opinion.

*By the Court.*—Judgments reversed and causes remanded with directions.