STATE of Wisconsin, Plaintiff-Respondent,

v.

Brett W. DUMSTREY, Defendant-Appellant.†

Court of Appeals

*No. 2013AP857–CR. Oral argument October 1, 2014.
—Decided December 23, 2014.*

2015 WI App 5

(Also reported in 859 N.W.2d 138.)

† Petition for Review filed.

626

On behalf of the defendant-appellant, the cause was submitted on the briefs of and oral argument by *Anthony D. Cotton* of *Kuchler & Cotton, S.C.*, Waukesha.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Bryan C. Bayer*, assistant district attorney of Waukesha and brief of *David H. Perlman*, assistant attorney general, and *J.B. Van Hollen*, attorney general. There was oral argument by *David H. Perlman*.

Before Brown, C.J., Neubauer, P.J., and Reilly, J.

¶ 1. NEUBAUER, P.J.[1] Brett W. Dumstrey appeals from a judgment of conviction for operating a motor vehicle while intoxicated (OWI), second offense. Dumstrey argues that the off-duty officer who pursued him in traffic violated Dumstrey's Fourth Amendment rights when the officer followed Dumstrey into the parking garage of Dumstrey's apartment complex and blocked the garage door so that on-duty officers could enter and arrest Dumstrey. We conclude that the warrantless and nonconsensual entry into Dumstrey's apartment complex parking garage did not violate Dumstrey's Fourth Amendment right to be free from unreasonable search and seizure because the area was not curtilage of Dumstrey's apartment home. It was not an area in which he had a reasonable expectation of privacy. The judgment of the circuit court is affirmed.

---

[1] This appeal was converted from a one-judge appeal to a three-judge appeal under Wis. Stat. Rule 809.41(3) (2011–12).

## FACTS

¶ 2. Officer Paul DeJarlais of the City of Waukesha Police Department testified regarding the events leading up to Dumstrey's arrest. DeJarlais encountered Dumstrey in traffic when he, DeJarlais, was off duty and driving his personal vehicle. DeJarlais noticed in his rearview mirror that a car, which turned out to be driven by Dumstrey, was approaching at a "very high rate of speed." Dumstrey passed DeJarlais at a high rate of speed and then slowed down and tailgated another vehicle. More than once, DeJarlais observed Dumstrey swerve into the adjacent lane, accelerate rapidly, and begin tailgating. Dumstrey was "driving directly in between the two lanes" before he "just took off very rapidly." At this point, around 11:30 p.m., DeJarlais called the police department and reported his observations. DeJarlais pulled up alongside Dumstrey at an intersection, where he made eye contact with Dumstrey and attempted to identify himself as a police officer by displaying his badge and photo identification. DeJarlais told Dumstrey that he had called the police and that Dumstrey should "wait here." Dumstrey did not respond and stared at DeJarlais with a "blank look on his face." DeJarlais saw that Dumstrey's eyes "were very like sleepy looking and they had a sheen to them. They were kind of glassy." DeJarlais testified that "from [his] training and experience over the years [Dumstrey] appeared to be very intoxicated."

¶ 3. Still stopped at the intersection, DeJarlais told Dumstrey to pull over. When the light turned green, DeJarlais went through the intersection and pulled over. Dumstrey stayed at the intersection for almost the entire green light, then went through the intersection and pulled alongside DeJarlais, in the middle of the traffic lane. DeJarlais again asked Dumstrey to wait; Dumstrey

waited "a couple seconds" and then drove off and turned into a driveway at the Riverwalk Apartments. DeJarlais followed the vehicle to the apartments, where Dumstrey drove around a parking lot before entering the parking garage through the remote-controlled door. DeJarlais parked his car partway through the door opening so that the door could not close. DeJarlais then entered the garage and made contact with Dumstrey. He again identified himself as a police officer and displayed his wallet with his badge. At that point, Officer Joseph Lichuki, an on-duty city of Waukesha police officer, arrived. Lichuki testified that Dumstrey's eyes were glassy and bloodshot, that his speech was slurred, that Lichuki could smell an odor of intoxicants coming from Dumstrey, and that Dumstrey was swaying back and forth. Dumstrey refused to perform field sobriety tests and refused to provide a preliminary breath test. Lichuki arrested Dumstrey for OWI.

¶ 4. Dumstrey moved to suppress the evidence obtained subsequent to DeJarlais' entrance into the apartment parking garage, arguing that such evidence was acquired in violation of the Fourth Amendment. The circuit court denied Dumstrey's motion. Dumstrey pleaded guilty to OWI, second offense, and this appeal followed.

¶ 5. At the hearing on the motion to suppress, DeJarlais estimated that the Riverwalk Apartments had five or six buildings with thirty apartments in each. He believed there were thirty stalls in the parking garage. Dumstrey testified that he used a garage door opener to get into the garage and otherwise "ha[d] a key for a locked door." While Dumstrey testified that the parking garage was not a common area for all the tenants, he also testified that other tenants could walk in and park in the parking garage. Dumstrey testified

that he would take an elevator to get to his apartment from the parking garage. "[I]t's a locked building. You have to live there to use [the elevator]." "[E]veryone pays for their space."

## DISCUSSION

¶ 6. Dumstrey challenges his conviction on Fourth Amendment grounds, arguing that DeJarlais committed a warrantless entry without probable cause or exigent circumstances. Specifically, he appeals the circuit court's denial of his motion to suppress evidence. Dumstrey does not contest that DeJarlais had reasonable suspicion to stop him, and the State concedes that "if the garage is curtilage, Officer DeJarlais improperly entered it to seize Dumstrey." Thus, we address the narrow question whether Dumstrey's parking garage was curtilage such that DeJarlais' entry into the parking garage was a warrantless and unreasonable search and seizure prohibited by the Fourth Amendment.

### Standard of Review

¶ 7. Our review of a circuit court's denial of a motion to suppress is mixed. We uphold the circuit court findings of fact unless they are clearly erroneous and review de novo the application of constitutional principles to those facts. *See State v. Grady*, 2009 WI 47, ¶ 13, 317 Wis. 2d 344, 766 N.W.2d 729. The determination of whether an area lies within a home's curtilage and is protected by the Fourth Amendment is an issue of constitutional fact to which we apply a two-step standard of review. *State v. Martwick*, 2000 WI 5, ¶ 16, 231 Wis. 2d 801, 604 N.W.2d 552. We first review the court's findings of evidentiary or historical facts under the clearly erroneous standard. *Id.*, ¶ 18. We then

631

review de novo the ultimate decision as to the extent of curtilage. *Id.*, ¶ 24. It is the defendant's burden to show a Fourth Amendment violation occurred by an invasion of protected curtilage. *Harney v. City of Chicago*, 702 F.3d 916, 924–25 (7th Cir. 2012); *see also State v. Guard*, 2012 WI App 8, ¶ 17, 338 Wis. 2d 385, 808 N.W.2d 718 (burden of establishing reasonable expectation of privacy is on defendant).

*Curtilage and the Reasonable Expectation of Privacy*

¶ 8. "The Fourth Amendment provides that 'people [are] to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . and [that] no Warrants shall issue, but upon probable cause . . . .' " *Martwick*, 231 Wis. 2d 801, ¶ 26 (quoting U.S. CONST. amend. IV; alterations in original); *see also* WIS. CONST. art. 1, § 11. This Fourth Amendment protection extends to the curtilage of the home, which is the area immediately adjacent to the home that harbors "the intimate activity associated with the sanctity of [one's] home and the privacies of life" and is considered part of the home for the purpose of the Fourth Amendment.[2] *Oliver v. United States*, 466 U.S. 170, 180 (1984) (citation omitted); *Martwick*, 231 Wis. 2d 801, ¶ 26 (noting that for purposes of the Fourth Amendment the curtilage is considered part of

---

[2] We note that there can be intrusions into curtilage that are not prohibited under the Fourth Amendment because the homeowner has implicitly given permission for entrance onto the property. *See, e.g., Florida v. Jardines*, 569 U.S. ___, ___, 133 S.Ct. 1409, 1415–16 (2013) (noting that police officer may approach house and knock "precisely because that is 'no more than any private citizen might do' ") (citation omitted). *See also* 1WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 2.3(f), at 781 (5th ed. 2012).

the home itself). The determination of whether an area is curtilage is fact specific. *State v. Leutenegger*, 2004 WI App 127, ¶ 21 n.5, 275 Wis. 2d 512, 685 N.W.2d 536. We must examine the facts of this case and decide whether Dumstrey's apartment parking garage was curtilage of his apartment home.

¶ 9. Whether Dumstrey's parking garage in his multiunit apartment complex was curtilage of his apartment home appears to be an unanswered question in Wisconsin. In *State v. Davis*, 2011 WI App 74, ¶¶ 3, 12, 333 Wis. 2d 490, 798 N.W.2d 902, we accepted the parties' characterization that a garage attached to a trailer home was curtilage. "Indeed, aside from viewing it as the home itself, it is difficult to imagine a scenario where the typical attached garage could be considered not curtilage." *Id.*, ¶ 12. On the other hand, in *Watkins v. State*, 59 Wis. 2d 514, 514, 208 N.W.2d 449 (1973) (per curiam), our supreme court held that a common storage room in the basement of an apartment building "was not within the defendant's constitutionally protected sphere of contemplated personal privacy." "This room was not for the exclusive use of the defendant and not even for the exclusive use of the tenants of the building," and therefore the entry into the room by the police was proper and reasonable. *Id.* at 514–15. To address whether Dumstrey's parking garage was part of the curtilage of his apartment home, we look to factors used to examine curtilage and reasonable expectation of privacy and case law from other jurisdictions applying those factors and then turn to a property-rights based trespass analysis.

■

¶ 10. In *United States v. Dunn*, 480 U.S. 294, 301 (1987), the Supreme Court set forth four factors that a court should consider when defining the extent of a home's curtilage:

the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

Our supreme court adopted these curtilage criteria in *Martwick*, 231 Wis. 2d 801, ¶ 30. These factors are not "a finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions." *Dunn*, 480 U.S. at 301. Rather, the factors are a useful tool to the extent they bear upon the relevant question—"whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*

¶ 11. Ultimately, for the Fourth Amendment's warrant requirement to apply, the defendant must have a reasonable expectation of privacy in the location of the search. *Guard*, 338 Wis. 2d 385, ¶ 16. "Whether a person has a reasonable expectation of privacy depends on (1) whether the individual has exhibited an actual, subjective expectation of privacy in the area inspected and . . . (2) whether society is willing to recognize such an expectation of privacy as reasonable." *State v. Trecroci*, 2001 WI App 126, ¶ 35, 246 Wis. 2d 261, 630 N.W.2d 555; *see also Katz v. United States*, 389 U.S. 347, 360–62 (1967) (Harlan, J., concurring) (discussing constitutionally protected reasonable expectation of privacy). Regarding the second prong, whether society is willing to recognize the defendant's expectation of privacy as reasonable, the *Trecroci* court set forth six factors to help determine if a person has a recognizable, reasonable expectation of privacy:

634

1. Whether the person had a property interest in the premises;

2. Whether the person was legitimately on the premises;

3. Whether the person had complete dominion and control and the right to exclude others;

4. Whether the person took precautions customarily taken by those seeking privacy;

5. Whether the person put the property to some private use; and

6. Whether the claim of privacy is consistent with historical notions of privacy.

*Trecroci*, 246 Wis. 2d 261, ¶ 36. "This list of factors is neither controlling nor exclusive. Rather, the totality of the circumstances is the controlling standard." *Guard*, 338 Wis. 2d 385, ¶ 17 (citation omitted). All of these factors describe spokes on the privacy wheel. *See Dunn*, 480 U.S. at 300 ("[T]he extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself."); *Oliver*, 466 U.S. at 180 ("[C]ourts . . . have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private."); *Martwick*, 231 Wis. 2d 801, ¶ 31 n.13 ("[T]he privacy issue is interwoven with the curtilage determination and need not be considered separately.").

¶ 12. Numerous other jurisdictions have determined that there is no constitutional violation in entering a common area or shared space in a multiunit

dwelling, including a shared parking garage, without a warrant. The most-cited case is *United States v. Cruz Pagan*, 537 F.2d 554 (1st Cir. 1976). There, federal agents entered Cruz Pagan's condominium building's underground parking garage to look for a van they believed was linked to Cruz Pagan or one of the codefendants. *Id.* at 557. The question was whether the agents' entry into the garage defeatedCruz Pagan's reasonable expectation of privacy. *Id.* The court reasoned "that a person cannot have a reasonable expectation of privacy . . . in such a well travelled common area of an apartment house or condominium." *Id.* at 558. The court noted that in a multiunit apartment complex, the area within the curtilage is more limited than in the case of a single family home. *Id.* The court held that the agents' entry into the condominium parking garage did not violate the Fourth Amendment and that therefore the evidence subsequently gathered should not be excluded. *Id.* (citing *Commonwealth v. Thomas*, 267 N.E.2d 489 (Mass. 1971)); *see also People v. Terry*, 454 P.2d 36, 47–48 (Cal. 1969) (no Fourth Amendment violation when police entered apartment parking garage that was "big" and would hold from five to one hundred five cars).

¶ 13. Both federal and state courts have consistently applied the reasoning of the *Cruz Pagan* court to hold that tenants of multiunit dwellings do not have a legitimate expectation of privacy in common or shared areas, including areas within a secured building. For example, in *State v. Nguyen*, 841 N.W.2d 676 (N.D. 2013), officers entered Nguyen's security-locked apartment building with a drug-sniffing dog to investigate the smell of marijuana reported by a tenant. *Id.* at 678. "The tenants of the apartment building share[d] secured, common hallways. In this shared space, personal property, such as shoes, bikes, and door craftwork, [was]

present." *Id.* The first officer entered the building "by catching the door before it closed when an unidentified female was either entering or leaving." *Id.* at 679. This first officer then let in another officer and the dog. *Id.* The court held that this entry into the secured common hallway was not a violation of Nguyen's expectation of privacy and that there was no trespass onto curtilage in violation of the Fourth Amendment. *Id.* at 682.

> The locked and secured entrance of Nguyen's apartment building was designed to provide security for the tenants of the apartment building rather than to provide privacy in the common hallways. *See [United States v.] Eisler*, 567 F.2d [814, 816 (8th Cir. 1977)]. "An expectation of privacy necessarily implies an expectation that one will be free of any intrusion, not merely unwarranted intrusions." *Id.* The common hallways of Nguyen's apartment building were available for the use of tenants and their guests, the landlord and his agents, and others having legitimate reason to be on the premises. *See id.* Nguyen could not bar entry to the apartment building. Other tenants of the apartment building had the ability to let in visitors, delivery persons, or other members of the public. Nguyen could not have excluded individuals from the common hallway. That the law enforcement officers were technical trespassers in the common hallways is of no consequence because Nguyen had no reasonable expectation that the common hallways of the apartment building would be free from any intrusion. *See id.* In this case, we conclude the entry by the law enforcement officers into the common hallways was not a search.

*Nguyen*, 841 N.W.2d at 681. *See also, e.g., United States v. Nohara*, 3 F.3d 1239 (9th Cir. 1993) (holding the defendant had no legitimate expectation of privacy in hallway of secured apartment building); *United States v. Acosta*, 965 F.2d 1248 (3rd Cir. 1992) (holding the defendant had no legitimate expectation of privacy in hallway

of apartment building); *United States v. Concepcion*, 942 F.2d 1170 (7th Cir. 1991) (holding the defendant had no legitimate expectation of privacy in common area of apartment building); *United States v. McGrane*, 746 F.2d 632 (8th Cir. 1984) (holding the defendant had no legitimate expectation of privacy in a basement storage locker in a multiunit dwelling, to which other residents had access); *United States v. Luschen*, 614 F.2d 1164 (8th Cir. 1980) (holding the defendant had no legitimate expectation of privacy in a landing of a secure apartment building); *Eisler*, 567 F.2d 814 (holding the defendant had no legitimate expectation of privacy in a conversation that took place in a hallway of a secure apartment building); *People v. Lyles*, 772 N.E.2d 962 (Ill. App. Ct. 2002) (holding the defendant had no legitimate expectation of privacy in back porch of apartment building); *Commonwealth v. Dora*, 781 N.E.2d 62 (Mass. App. Ct. 2003) (holding the defendant had no legitimate expectation of privacy in hallway of secured apartment building); *State v. Davis*, 711 N.W.2d 841 (Minn. Ct. App. 2006) (holding the defendant had no legitimate Fourth Amendment expectation of privacy in common hallway of apartment building); *Commonwealth v. Reed*, 851 A.2d 958 (Pa. Super. Ct. 2004) (holding the defendant had no legitimate expectation of privacy in common hallway and stairs of secured apartment building); *State v. Talley*, 307 S.W.3d 723 (Tenn. 2010) (holding the defendant had no legitimate expectation of privacy in hallway of secured condominium).

¶ 14. Applying the guiding principles and factors discussed above, we conclude that under the totality of circumstances the parking garage was not curtilage. The common or shared area analysis applies to this case. There was unrefuted testimony that there were thirty

stalls in the parking garage, an area that was used exclusively for parking cars. While the underground garage was connected to Dumstrey's apartment building, and the outside access was limited to tenants and shielded from the general public with entry by remote control, Dumstrey shared the garage with the landlord and the other tenants who park there and their invitees. Many others, including strangers to Dumstrey, regularly had access. Given Dumstrey's lack of complete dominion and control and inability to exclude others, including the landlord and dozens of tenants and their invitees, we conclude that the parking garage was not curtilage of Dumstrey's home.[3] Such a space, open to and shared with dozens of other people for the sole purpose of parking cars, was not an area in which Dumstrey would reasonably feel free to carry on "the intimate activity associated with the sanctity of [one's] home and the privacies of life." *Oliver*, 466 U.S. at 180 (citation omitted). Nor did Dumstrey have a reasonable expectation that the common, shared garage would be free from any intrusion. *See Eisler*, 567 F.2d at 816 ("An expectation of privacy necessarily implies an expectation that one will be free of any intrusion, not merely unwarranted intrusions."). Under the facts presented, the parking garage was not curtilage of Dumstrey's apartment home.

*Trespass*

¶ 15. Dumstrey argues that the dispositive question is whether DeJarlais committed a trespass when he

---

[3] Neither party addresses the nature of the property interest Dumstrey had in the garage area, i.e., whether he is a licensee of the landlord, etc. We will assume without deciding that he has a property interest of some type and that the officer was trespassing.

entered the parking garage. But if a trespass is not on curtilage, there is not Fourth Amendment protection. *United States v. Jones*, ___ U.S. ___, 132 S. Ct. 945, 953 (2012); *Oliver*, 466 U.S. at 183 (even though government intrusion upon property beyond the curtilage is a trespass at common law, it is not a search in the constitutional sense). Dumstrey cites *Jones* for the proposition that "the *Katz* reasonable-expectation-of-privacy test has been *added to,* not *substituted for,* the common-law trespassory test." *Jones*, 132 S. Ct. at 952. But the common-law trespassory test tells us that the government's intrusion on one's land is only a Fourth Amendment violation "when the government gains evidence by physically intruding on constitutionally protected areas." *Florida v. Jardines*, 569 U.S. ___, 133 S. Ct. 1409, 1417 (2013).

¶ 16. *Jones, Jardines,* and *State v. Popp*, 2014 WI App 100, 357 Wis. 2d 696, 855 N.W.2d 471, all involved constitutionally protected areas. *Jones* involved a car, an undisputed "effect" under the Fourth Amendment. *Jones*, 132 S. Ct. at 949 (noting that Fourth Amendment protects the right of people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures). *Jardines* addressed a drug-sniffing dog coming onto Jardines' front porch—"the classic exemplar of an area adjacent to the home and to which the activity of the home life extends." *Jardines*, 133 S. Ct. at 1415 (citation omitted). And *Popp* was about police walking onto the curtilage surrounding a trailer home and peering in the window. *Popp*, 357 Wis. 2d 696, ¶ 20. Rather than support Dumstrey's position, *Jones, Jardines,* and *Popp* reaffirm that a trespass by a government agent "is of no Fourth Amendment significance" unless it is on one of those protected areas enumerated in the Fourth Amendment. *See*

640

*Jones*, 132 S. Ct. at 953; *see also Conrad v. State*, 63 Wis. 2d 616, 624–25, 218 N.W.2d 252 (1974) (holding that protection of Fourth Amendment does not extend beyond curtilage even when government agent committed an "outrageous trespass"). Dumstrey has not established that his parking garage was a constitutionally protected area. *See Cruz Pagan*, 537 F.2d at 558 ("Whether or not the agents' entry was a technical trespass is not the relevant inquiry."); *Terry*, 454 P.2d at 48 ("Even if such an entry constitutes a trespass, a simple trespass without more does not invalidate a subsequent search and seizure."); *Nguyen*, 841 N.W.2d at 681 ("That the law enforcement officers were technical trespassers in the common hallways is of no consequence because Nguyen had no reasonable expectation that the common hallways of the apartment building would be free from any intrusion.").

¶ 17. Because the shared parking garage was not curtilage of Dumstrey's apartment, there was no Fourth Amendment violation in DeJarlais' entry into the parking garage.

*By the Court.*—Judgment affirmed.

¶ 18. REILLY, J. *(dissenting)*. I respectfully dissent. Dumstrey's nonpublic, locked, enclosed, underground, elevator-accessed garage is curtilage, and the government's entry into the garage was unreasonable under the circumstances. The State acknowledged at oral argument that if the garage door had closed before DeJarlais broke the security sensor, it would have been unreasonable under the Fourth Amendment for the State to forcibly break down the garage door to search/seize Dumstrey. I see little difference in the

reasonableness of the government breaking through a door or breaking the door's security system in order to gain entry.

¶ 19. A more comprehensive look at the facts of this case is necessary for the fact-intensive inquiry that the Fourth Amendment requires. *See State v. Dearborn*, 2010 WI 84, ¶ 46, 327 Wis. 2d 252, 786 N.W.2d 97. Dumstrey lives in a rented unit of a multistory apartment building. Dumstrey has a parking space allotted to him in the garage, which is located within the four walls of the apartment building and beneath Dumstrey's apartment. The garage is nonpublic and ingress and egress is by a remote-controlled garage door and a locked interior door. Access from the garage to the apartments is by elevator.

¶ 20. DeJarlais was off duty and returning from a Brewers game when he tried to stop Dumstrey by flashing his badge and giving a verbal command. The assistant attorney general at oral argument admitted that he would not advise his daughter to follow any such command. Dumstrey likewise disregarded DeJarlais and proceeded to a safe and secure location: his underground garage. DeJarlais followed and wedged his car in the garage-door opening so as to prevent the garage door from closing. The State admits that no exigent circumstances existed.

*Curtilage*

¶ 21. The foremost question in this appeal is whether Dumstrey's garage is curtilage. As the majority correctly recites, curtilage is actually "considered part of the home itself for Fourth Amendment purposes" and is defined as "the area to which extends the intimate activity associated with the sanctity of a man's home

642

and the privacies of life." *Oliver v. United States*, 466 U.S. 170, 180 (1984) (citation omitted). Curtilage also has been described as the land and buildings immediately surrounding a house. *United States v. Dunn*, 480 U.S. 294, 300 & n.3 (1987). The State acknowledges that if Dumstrey's garage is curtilage, then the police actions in this case are "problematic" as they did not have sufficient justification to enter Dumstrey's home or its curtilage without a warrant, and thus, the seizure would be considered unconstitutional.

¶ 22. A court determines whether property is curtilage by applying the four-factor *Dunn* test—an analysis acknowledged but then not applied by the majority because it cannot do so without defeating its conclusion. The four factors that a court is to apply when defining the extent of a home's curtilage are: (1) "the proximity of the area claimed to be curtilage to the home"; (2) "whether the area is included within an enclosure surrounding the home"; (3) "the nature of the uses to which the area is put"; and (4) "the steps taken by the resident to protect the area from observation by people passing by." *Id.* at 301; *see also State v. Martwick*, 2000 WI 5, ¶ 30, 231 Wis. 2d 801, 604 N.W.2d 552.

¶ 23. Applying the *Dunn* factors to Dumstrey's garage mandates a finding of curtilage. First, Dumstrey's garage is located in direct proximity to Dumstrey's home (directly beneath it) and is tethered to the home by an elevator. Second, Dumstrey's garage is fully enclosed within the same four walls of the apartment building that enclose Dumstrey's residence (i.e., it is an "attached" garage) and is entirely shielded from the general public as it is a gated, underground garage. Third, Dumstrey uses his garage in many of the same ways that middle America utilizes its garages in the "privacies of life"—the keeping and storing of his vehicle in a secure setting, the

643

ability to have a relatively warm vehicle during Wisconsin's frigid winters, the avoidance of wind and rain when accessing his vehicle, the safety and security of an elevator from garage to residence, and the avoidance of crime in the open city streets. Lastly, Dumstrey chose a residence that has an underground garage protected from open observation and entry by both the general public and the government. Dumstrey's garage is as much an "attached garage" as is any garage attached to a single-family home.

¶ 24. I shall not bore the reader with pages of string cites from cases that have found garages to be curtilage; rather, I offer only two from Wisconsin that are binding on this court. In *Bies v. State*, 76 Wis. 2d 457, 461–63, 251 N.W.2d 461 (1977), the Wisconsin Supreme Court agreed with the parties that a garage accessed through an alley and outside door was protected by the Fourth Amendment as it was part of the curtilage of the home. In *State v. Davis*, 2011 WI App 74, ¶ 12, 333 Wis. 2d 490, 798 N.W.2d 902, this court indicated that it is difficult to imagine a scenario where a typical attached garage could not be considered curtilage. The majority restricts *Davis* to single-family homes and concludes that Dumstrey's attached garage is not curtilage because it is shared with cotenants. Majority, ¶ 14. While the eyes and ears of the government are constitutionally prohibited from roaming the private garages of single-family residences, the majority denies the "privacies of life" to those who live in urban America.

¶ 25. Ignoring the *Dunn* factors, the majority supports its conclusion by resting upon whether Dumstrey had a "reasonable expectation of privacy" in the garage vis a vis his landlord, fellow tenants, and their guests. Majority, ¶¶ 12–13. The majority misses

the distinction that the Fourth Amendment protects against unreasonable government action rather than a loss of privacy with those we contractually agree to live with in a multiunit building. Nowhere does the Constitution proclaim that citizens who share common space in a multiunit residence forfeit their right to be free from unreasonable government search and seizure. "[T]he correct inquiry is whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." *Oliver*, 466 U.S. at 182–83. The fact that Dumstrey and his cotenants share the garage does not defeat the fact that each of the tenants has secured the garage from the general public and the government through their collective actions. Dumstrey may have a lessened amount of privacy among his fellow tenants, but he and his fellow tenants retain their constitutional right to be free from unreasonable government intrusions.

### Trespass and Privacy

¶ 26. The majority's privacy analysis ignores not only the *Dunn* factors but also a citizen's constitutional right to be free of governmental trespass. In *Florida v. Jardines*, 569 U.S. ___, 133 S. Ct. 1409, 1416–18 (2013), the United States Supreme Court concluded that bringing a drug-sniffing dog onto a front porch is a trespass and hence a search under the Fourth Amendment. The Court first held that a front porch is curtilage despite a front porch being open and visible to the public, solicitors, mailmen, girl scouts, etc. *Id.* at 1415–16. Despite its openness and lack of privacy, a front porch is "intimately linked to the home, both physically and psychologically." *Id.* at 1415 (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)).

645

¶ 27. *Jardines* held that while a police officer may approach a home and knock—as that is what any private citizen can do—social norms do not allow a police officer to trespass, i.e., conduct a search by bringing a drug-sniffing dog onto curtilage. *Id.* at 1415–16. The *Jardines* majority concluded that an analysis of whether Jardines had an "expectation of privacy" in his curtilage was unnecessary as the trespass to Jardines' curtilage to gather evidence was itself a search. *Id.* at 1417. The three concurring justices in *Jardines* went further and found that the government use of a drug-sniffing dog also invaded Jardines' "reasonable expectation of privacy." *Id.* at 1418 (Kagan, J., concurring). The government's physical intrusion upon the curtilage by a drug-sniffing dog violates a "minimal expectation of privacy." *Id.* at 1419 (citation omitted). The concurring justices offered a final and important reminder: the government is not precluded from the use of a drug-sniffing dog and searching curtilage; the government simply needs to obtain a warrant or have exigent circumstances to do so. *Id.* at 1419–20.

¶ 28. DeJarlais' entry into Dumstrey's home (his garage) was both a trespass, i.e., it was without Dumstrey's (or any of his cotenants') consent and for the purpose of gathering evidence, and a violation of Dumstrey's "minimal expectation of privacy," via the deactivation of Dumstrey's security system. Our constitution provides the government a way to avoid this violation of Dumstrey's constitutional rights: obtain a warrant. I respectfully dissent.