COURT OF APPEALS
DECISION
DATED AND FILED

September 18, 2019

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP926-CR**

Cir. Ct. No. **2016CF703**

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT II**

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

TROY K. KETTLEWELL,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Winnebago County: DANIEL J. BISSETT, Judge. *Reversed and cause remanded for further proceedings.*

¶1 NEUBAUER, C.J.[1] Troy K. Kettlewell appeals from a judgment of conviction for operating a motor vehicle while under the influence (OWI), fourth

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(f) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version.

offense. Kettlewell argues the circuit court erred in denying his motion to suppress evidence obtained when police officers conducted a warrantless search of his home. The State contends the warrantless entry was justified on the ground that the police were functioning under the community caretaker exception to the warrant requirement. We disagree. We reverse and remand for further proceedings.

## BACKGROUND

¶2 On December 24, 2016, at approximately 3:05 p.m., a witness reported a man leaving a vehicle in a ditch near an intersection in Winnebago County. The witness also reported that the man was slurring his speech and "might possibly be intoxicated," but did not appear to be injured. The witness did not report that the subject had any problems walking.

¶3 Deputy Michael Huth responded to the accident call and, based on information that Kettlewell was a registered owner of the vehicle, first went to a nearby residence of a cousin of Kettlewell's to see if Kettlewell was there. He was not, but the cousin called Kettlewell to let him know that the police were looking for him. Huth then had a brief conversation with Kettlewell, who "immediately" stated that Tamara Tracy had been driving the vehicle. When Huth asked Kettlewell where he was, Kettlewell allegedly "mumbled" something that Huth could not understand and hung up.

¶4 Huth then went to the accident scene. Upon inspection of the vehicle, he noted the following: no broken glass, no window or windshield damage, no blood visible on or near the vehicle, and no other indications of personal injury within the vehicle. Huth saw a half-full bottle of beer and a prescription medicine container with Kettlewell's name. Huth concluded the

2

vehicle had been traveling east on the highway when it entered the ditch, went over a side road, and continued in the ditch along the highway for a short distance before becoming stuck in the snow. He noted the side air bags had deployed, but not the front ones. No other vehicles were involved in the accident.

¶5 When Huth ran the plate number through dispatch, Tracy was also identified to be an owner. Tracy, Kettlewell's girlfriend, was at the scene when Huth arrived. Huth noticed one set of distinct footprints in the snow leading away from the vehicle which did not match Tracy's footprints. Tracy admitted to Huth that Kettlewell had been driving. Huth did not see any blood in the snow, nor did he note anything problematic about the footprint trail leading away from the car. Tracy did not state Kettlewell was injured, nor did Huth inquire as to Kettlewell's well-being. Kettlewell later told the officers that Tracy had driven out to pick him up and take him home.

¶6 Deputies Marcus Schuh and Nathan Olig also responded to the accident, reporting to the address associated with the vehicle's registered owners. Dispatch advised Schuh that the witness said that the driver might have been intoxicated due to his slurred speech. Dispatch also relayed to Schuh that the air bags had deployed.

¶7 Schuh and Olig first approached the front door and knocked loudly for an unknown amount of time, possibly thirty seconds to a few minutes. Schuh peered into the small windows of the garage and saw no vehicles. Although the record indicates that dispatch had several phone numbers available to reach Kettlewell, neither Olig nor Schuh attempted to call the numbers, nor did Olig know whether dispatch or anyone else had attempted to do so.

¶8 Receiving no response after knocking at the front door, Olig testified Schuh "decided to walk around the house to see if he could see anybody inside the residence." Olig stated that he "informed Deputy Schuh that the reason that he was able to walk around the house was because we were checking on the welfare of an individual that was involved in an accident crash where air bags deployed. We were concerned for his well-being."

¶9 Schuh testified that he decided to walk around the "house to see if there was some other place where [I] could make observations or anything." Schuh saw in one window a female in her "low teens." The female was Kettlewell's fourteen-year-old daughter, Carrissa Kettlewell, who testified that she had been taking a shower when she heard loud banging at the front door. Carrissa got out of the shower, put on a robe, and when she got to the room near the front door, she saw a strange man looking in at her through a window, prompting her to run screaming from the room.

¶10 Schuh then walked around the house in search of the back door, peering into each window as he went. There was no walkway. Schuh came upon a patio with stairs and sliding glass doors leading to the residence. Inside was a bedroom with a man whom Schuh determined to be Kettlewell, apparently asleep with his boots on. Schuh knocked on the glass doors to get Kettlewell's attention, and then told Kettlewell several times to go to the front door so that he and Olig could speak with him. Kettlewell acknowledged and left the room. The record does not reveal if Schuh asked Kettlewell if he was all right.

¶11 Schuh quickly returned to the front of the house. Olig was inside the house speaking with Kettlewell. Both Schuh and Olig asked whether Kettlewell had been driving the vehicle and how much he had to drink before asking any

questions about his well-being. Ultimately, Kettlewell admitted to driving the vehicle. The deputies then asked him to come outside so that standardized field sobriety tests could be administered, after which Kettlewell was arrested for and charged with OWI.

¶12    Kettlewell moved to suppress all evidence obtained as a result of the officers' encounter with him. After two hearings, the circuit court denied the motion, concluding the search was justified as a valid exercise of the police's community caretaker function.

¶13    Kettlewell then pled no contest to one count of OWI as a fourth offense. Kettlewell appeals.

## DISCUSSION

*Standard of Review and Applicable Fourth Amendment Law*

¶14    A circuit court's findings of historic fact will not be overturned unless clearly erroneous. *State v. Fonte*, 2005 WI 77, ¶11, 281 Wis. 2d 654, 698 N.W.2d 594. Whether an officer performs as a community caretaker that satisfies the demands of the federal and state constitutions is a question of constitutional fact, which we review independently. *State v. Kramer*, 2009 WI 14, ¶16, 315 Wis. 2d 414, 759 N.W.2d 598.

¶15    The federal and state constitutions protect against all unreasonable searches and seizures. *State v. Pinkard*, 2010 WI 81, ¶13, 327 Wis. 2d 346, 785 N.W.2d 592. "Subject to a few well-delineated exceptions, warrantless searches are deemed per se unreasonable under the Fourth Amendment." *Id.* (citation omitted). In agreement with the United States Supreme Court, our state courts have recognized that, in order to protect persons and property, police officers who

are serving a community caretaker function may be allowed to conduct warrantless searches and seizures. *Id.*, ¶14.

¶16     To overcome the presumption that a search of a home without a warrant is per se unreasonable under the caretaker exception, three steps must be met:  (1) did a search within the Fourth Amendment occur?; (2) if so, were the police exercising a bona fide community caretaker function?; and (3) if so, does "the public interest outweigh[] the intrusion upon the privacy of the individual such that the community caretaker function was reasonably exercised within the context of a home?" *Id.*, ¶29.

*A Search Under the Fourth Amendment Occurred*

¶17     The State concedes that Kettlewell's curtilage is constitutionally protected.[2]  Given Schuh's entry into the back yard peering through every window and Olig's entry into the home, the State also concedes a search under the Fourth Amendment occurred.  *See State v. Popp*, 2014 WI App 100, ¶26, 357 Wis. 2d 696, 855 N.W.2d 471 (officers walking up back steps, onto the porch, and peering into the window constituted a search subject to constitutional protections).  The first factor of the community caretaker exception is met.  There was a search.

---

[2]  "Curtilage is the area immediately adjacent to the home to which a person extends the intimate activities associated with the privacies of life" and is treated as functionally identical to the interior of the home itself for constitutional purposes. *State v. Wilson*, 229 Wis. 2d 256, 264, 600 N.W.2d 14 (Ct. App. 1999).

*The Objective Facts Do Not Support a Bona Fide Community Caretaker Function*

¶18     The second step requires us to determine whether the police were exercising a bona fide community caretaker function at the time of the search. The test is whether the police had an "objectively reasonable basis to believe [that] there is a member of the public who is in need of assistance." ***State v. Maddix***, 2013 WI App 64, ¶20, 348 Wis. 2d 179, 831 N.W.2d 778 (alteration in original; citations omitted). The State bears the burden of proving that the officers' conduct fell within the scope of a reasonable community caretaker function. ***State v. Ziedonis***, 2005 WI App 249, ¶15, 287 Wis. 2d 831, 707 N.W.2d 565.

¶19     At one time, there was a question as to whether the community caretaker function had to be "totally divorced from the detection, investigation, or acquisition of evidence" relating to a crime and whether the officer's subjective intent played a role. *See **Kramer***, 315 Wis. 2d 414, ¶¶23-24, 30 (citation omitted). Our supreme court decided that simply because an officer may be contemplating law enforcement factors at the time, as long as, under the totality of the circumstances, it is established that there is an objectively reasonable basis for the community caretaker function, the subjective intent does not negate the caretaker function. ***Id.***, ¶30.

¶20     We conclude that, during the time Schuh passed through the curtilage of the home and peered through windows, and Olig entered the home after Schuh directed Kettlewell to the front door, there was not an objectively reasonable basis to believe that Kettlewell was in need of assistance. The police were not conducting a bona fide community caretaker function and therefore a warrant was required.

¶21    This was a one-car accident with no apparent damage or resulting injury.  Some, but not all, of the air bags deployed—not surprising for a car driven into a ditch.  Although air bag deployment and the slurred speech could indicate harm, the citizen witness reported that Kettlewell walked away and did not report any apparent injury.  When Huth spoke with Kettlewell, he advised that Tracy had been driving, mumbled something and then hung up, which does not necessarily point to physical injury.

¶22    At the scene, it was clear that Tracy had come to the scene of the accident and as such, it was reasonable to infer that she was there because Kettlewell had contacted her.  Had Huth asked Tracy about Kettlewell's well-being, he presumably could have learned that Tracy had picked Kettlewell up and taken him to their home, and sought information on how he was doing.

¶23    At Kettlewell's home, Schuh walked around the house and peered through windows, seeing Kettlewell's fourteen-year-old daughter inside.  He proceeded to the back patio, looking in every window, waking Kettlewell, and yelling to him several times to go to the front door so that they could talk to him.  Schuh did not ask about his welfare nor did Kettlewell state he needed help.  Although Schuh hurried to the front door, Kettlewell had already let Olig in, who was questioning him.  Schuh admitted that Kettlewell was first asked about his driving and his drinking before questions were asked about his health.

¶24    What is most striking is that, in addition to the citizen witness, Kettlewell had contact with three separate people who could and likely would have noted if he were injured and not simply intoxicated:  his girlfriend, his fourteen-year-old daughter, and to a lesser extent his cousin.  While the officers indicated concern for Kettlewell's well-being, they did not ask any of these people

about Kettlewell's well-being or to assist in determining if he needed immediate help. Their questions were largely focused on his drinking and driving. In other words, while they testified to a subjective concern for Kettlewell's well-being, their questions are the objective behavior we evaluate in considering the totality of circumstances and, specifically, whether there was a manifestation of a serious injury.

¶25 *State v. Ultsch*, 2011 WI App 17, 331 Wis. 2d 242, 793 N.W.2d 505, guides our determination. Ultsch's vehicle was damaged significantly, but the damage was limited to the left front fender, and "[t]he airbags had not deployed, the windshield was intact, there was no damage to the passenger compartment or to the driver's side door, and there was no blood or other indication of injury." *Id.*, ¶19. The crash caved in a portion of a brick building, potentially compromising the building's structural integrity. *Id.*, ¶2.

¶26 The driver had left the scene and the vehicle was found about two to three miles away at the beginning of a snow-covered and long driveway. *Id.*, ¶¶2-3. The driver had obviously traversed the long, snowy driveway and made it into the house. *Id.*, ¶3. The officers had no information to suggest that Ultsch was hurt and, in fact, her boyfriend drove down the driveway and told the officers she was inside her residence and possibly asleep. *Id.* The boyfriend said nothing of needing assistance, nor did the police ask. *Id.*, ¶20. Going up the long driveway, the police saw no blood or sign of injury. *Id.*, ¶21. The police entered the residence, gave Ultsch field sobriety tests, and arrested her. *Id.*, ¶¶4-5.

¶27 We determined that these facts did not give rise to an objectively reasonable belief that Ultsch was in need of assistance, and therefore the search was not part of a bona fide exercise of the community caretaker function. *Id.*,

¶¶15, 22. We recognized that stricter scrutiny is applied to an encounter in the home, as opposed to an encounter in a vehicle. *Id.*, ¶18. There was "good reason to believe that [Ultsch] was intoxicated and almost no reason to think that she was in distress[,]" and "there [was] very little indication of any danger to Ultsch." *Id.*, ¶25.

¶28 Although there are differences between the cases, there are significant similarities. Both cases involved car accidents that might have caused personal injury, but there were no facts indicating injury, e.g., no blood, no broken windshield, or damage to the driver's compartment. Indeed, in *Ultsch*, the damage to the car and building was significant, and here there was none.

¶29 Both cases involved third parties who had observed the driver after the accident and did not report any need for assistance. Indeed, the officers could have fairly presumed that the boyfriend in *Ultsch* and the citizen witness, Tracy or the daughter would have noted if medical help were called for. While the accident itself and the alleged slurred speech in this case led the witness to report a possibly intoxicated driver, there was no objectively reasonable basis to conclude that the driver was in need of immediate medical assistance. *Ultsch* supports our determination. *Compare State v. Gracia*, 2013 WI 15, ¶¶21-22, 345 Wis. 2d 488, 826 N.W.2d 87 (traffic pole knocked down, extensive car damage, and a brother concerned enough to break down a bedroom door to allow police to check on him).

*The Objective Facts Do Not Support a Reasonable Exercise of Any Community Caretaker Function*

¶30 Even if we assume the police were engaged in a bona fide community caretaker function, the State also fails to carry its burden to show any

such function was reasonably exercised. In balancing the public's interest against the degree and nature of the intrusion on the individual's privacy under the third part of the test, we consider:

> (1) the degree of the public interest and the exigency of the situation; (2) the attendant circumstances surrounding the [search], including time, location, the degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished.

*Pinkard*, 327 Wis. 2d 346, ¶42 (alteration in original; citation omitted).

¶31 On the first factor, the degree of public interest and exigency of the situation, we agree with the circuit court that there is a substantial public interest in ensuring that seriously injured individuals receive immediate medical treatment. However, as discussed above, there was very little indication of any danger to Kettlewell.

¶32 The second factor, the time and location of the search, and the degree of overt authority and force displayed, also weighs against a valid exercise of any caretaker function. The officers entered Kettlewell's curtilage and peered in every window even after seeing Kettlewell's daughter. Without inquiring whether he needed help, Schuh repeatedly directed Kettlewell to get out of bed and go to the front door to speak to the officers, and Olig had already entered the residence before Schuh returned to the front door, clearly constituting a substantial overt display of authority.[3]

---

[3] As noted above, Olig entered the residence and was already questioning Kettlewell before Schuh quickly returned to the front door. There is no indication in the record and no argument by the parties that the entry was consensual.

¶33    As to the third factor, although Kettlewell's vehicle was at issue, his residence was subject to police conduct.  As noted above, "one has a heightened privacy interest in preventing intrusions into one's home." *Id.*, ¶56.

¶34    Regarding the fourth factor, the officers had viable alternatives to searching Kettlewell's home without a warrant.  Most importantly, they could have asked Tracy if he needed help or sought her assistance to ensure that he was not injured.  She was his live-in girlfriend, a co-owner of the car, at the accident scene, and had just taken him home.  There is no indication that the officers inquired about, much less sought Tracy's engagement to verify, whether or not Kettlewell had been seriously injured.

¶35    The officers also could have attempted to reach the residents in the home with phone numbers dispatch had available.  After the daughter was seen, the officers could have recommended knocking on the door to ask her whether Kettlewell needed help.  They could have asked Kettlewell when he was located through the patio doors whether he needed help.  *See Popp*, 357 Wis. 2d 696, ¶22 (at the "very core" of the Fourth Amendment is the right to retreat into one's home, and "the right to retreat would be significantly diminished if the police could enter a [person's] property to observe his [or her] repose from just outside the front window") (quoting from *Florida v. Jardines*, 569 U.S. 1, 6 (2013)).  Balancing all of the above factors, we conclude the public's interest in the intrusion was minimal, and as such, any discernable community caretaker function was unreasonably exercised.

¶36    Accordingly, we conclude that the circuit court erred by determining the officers' conduct was permissible under the community caretaker exception to the warrant requirement.[4]

*By the Court.*—Judgment reversed and cause remanded for further proceedings.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

---

[4] We cannot avoid noting the poor briefing effort by the State. The brief is barely three pages long, accepts Kettlewell's recitation of the facts and iterates applicable community caretaker law. The only argument addressing the facts of this case is a one-sentence statement that when a car in a ditch has its air bags deployed, it is serious enough for the police to perform the caretaker function by knocking on the driver's curtilage windows. This undeveloped argument, failing to apply controlling case law to the facts of this case, all but concedes the arguments set forth by Kettlewell. *See State v. Pettit*, 171 Wis. 2d 627, 647, 492 N.W.2d 633 (Ct. App. 1992) (the court of appeals does not develop arguments for a litigant).